UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

SHONE BROWN,                                        Case No. 13 CV 6912
                              Plaintiff,            (TPG) (SN)

        -against-                                   **AMENDED COMPLAINT**

THE CITY OF NEW YORK, COMMISSIONER                  JURY DEMAND
JOSEPH BRIAN PONTE, WARDEN BRIAN SUPRENANT,
ACTING WARDEN FELIPE LABORIEL [SHIELD #
561], DEPUTY WARDEN DANIEL O'CONNELL,
ASSISTANT DEPUTY WARDEN RAYMOND
A. BELTZ [SHIELD # 161], CAPTAIN EDWIN
SKEPPLE [SHIELD # 1118], CAPTAIN RONALD
RUDOLPH [SHIELD # 551], C.O. REGINA JAMES
[SHIELD # 3563], C.O. KENYONDA GRINKLEY
[SHIELD # 10400], C.O. TRETJEN [SHIELD # 1380]
and C.O. JOSE F. FREIRE [SHIELD # 2089],
                              Defendants.

------------------------------------------------------------------------X

Plaintiff, SHONE BROWN, by his attorney, The Law Offices of UGO UZOH, P.C.,

complaining of the defendants herein, The City of New York, Commissioner Joseph

Ponte, Warden Brian Suprenant, Acting Warden Felipe Laboriel [Shield # 561], Deputy

Warden Daniel O'Connell, Assistant Deputy Warden Raymond A. Beltz [Shield # 161],

Captain Edwin Skepple [Shield # 1118], Captain Ronald Rudolph [Shield # 551], C.O.

Regina James [Shield # 3563], C.O. Kenyonda Grinkley [Shield # 10400], C.O. Tretjen

[Shield # 1380] and C.O. Jose F. Freire [Shield # 2089] (collectively, "defendants"),

respectfully alleges as follows:

<u>NATURE OF THE ACTION</u>

1.       This is an action at law to redress the deprivation of rights secured to the

         plaintiff under color of statute, ordinance, regulation, custom, and/or to

         redress the deprivation of rights, privileges, and immunities secured to the

         plaintiff by the First, Fourth, Eighth and Fourteenth Amendments to the

         Constitution of the United States, and by Title 42 U.S.C. § 1983, and arising

         under the law and statutes of the City and State of New York.

<u>JURISDICTION</u>

2.       The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, 28
U.S.C. § 1343, 28 U.S.C. § 1331 and 28 U.S.C. § 1367, and under the First,
Fourth, Eighth and Fourteenth Amendments to the United States
Constitution.

3.       As the deprivation of rights complained of herein occurred within the
Southern District of New York, venue is proper in this district pursuant to 28
U.S.C. § 1391 (b) and (c).

<u>COMPLIANCE WITH N.Y. GEN. MUN. LAW REQUIREMENTS</u>

4.       Plaintiff timely made and served a notice of claim upon the defendants in
compliance with N.Y. Gen. Mun. Law § 50-e.

5.       At least thirty days have elapsed since the service of aforesaid notice of
claim and adjustment or payment thereof has been neglected or refused.

6.       This action is commenced within one year and ninety days after the
happening of the event(s) upon which the claim(s) is based.

<u>THE PARTIES</u>

7.       Plaintiff is and was at all times material herein a resident of the United States
and the State of New York.

8.       Defendant City of New York ("City") is a municipal corporation duly
organized and existing under the laws of the State of New York.

9.       The City of New York Department of Correction ("DOC") is an agency of
the City, and all officers and/or officials referred to herein were at all times
relevant to this Complaint employees and agents of the City.

10.      Defendant Ponte is the Commissioner of DOC who replaced former
Commissioner Dora Schriro in or about April 2014. He is named here in his
official and individual capacities.

11.      Defendant Suprenant was at all times material herein a senior supervisory
official employed by DOC as Warden in charge of Central
Intake/Classification Unit, and was responsible for inmate custody
management including, but not limited to, inmate classification and auditing
of inmate records. Defendant Suprenant was responsible for overseeing all

activities of Central Intake/Classification Unit including, but not limited to, hiring, training, supervision and discipline of Intake/Classification Unit staff including some of the individual defendants named herein. He is named here in his official and individual capacities.

12.     Defendant Laboriel was at all times material herein a senior supervisory official employed by DOC as Acting Warden in charge of George Motchan Detention Center ("GMDC"). Upon information and belief, Defendant Laboriel was responsible for overseeing all activities at GMDC including, but not limited to, hiring, training, supervision and discipline of GMDC staff including several of the individual defendants named herein. Defendant Laboriel was also responsible for the care, welfare, security and custody of all inmates held in GMDC. He is named here in his official and individual capacities.

13.     Defendant O'Connell was at all times material herein a senior supervisory official employed by DOC as Acting Warden and/or Deputy Warden in charge of GMDC. Upon information and belief, Defendant O'Connell was responsible for overseeing all activities at GMDC including, but not limited to, hiring, training, supervision and discipline of GMDC staff including several of the individual defendants named herein. Defendant O'Connell was also responsible for the care, welfare, security and custody of all inmates held in GMDC. He is named here in his official and individual capacities.

14.     Defendant Beltz was at all times material herein a senior supervisory official employed by DOC as Assistant Deputy Warden and assigned to GMDC. Upon information and belief, Defendant Beltz was responsible for supervising the various tours and assignments of several uniformed officers assigned to GMDC as a tour commander. Defendant Beltz was also responsible for investigating any and all incidents at GMDC including, but not limited to, inmate assaults and unusual occurrences. He is named here in his official and individual capacities.

15.     Defendant Skepple was at all times material herein a supervisory official employed by DOC and assigned to GMDC. Upon information and belief,

Defendant Skepple was responsible for supervising several uniformed officers assigned to GMDC. Defendant Skepple was also responsible for investigating any and all incidents at GMDC including, but not limited to, inmate assaults and unusual occurrences. He is named here in his official and individual capacities.

16.     Defendant Rudolph was at all times material herein a supervisory official employed by DOC and assigned to intake and the probe team responsible for responding to incident alerts including, but not limited to, inmate assaults and unusual occurrences. He is named here in his official and individual capacities.

17.     Defendant James was at all times material herein a correction officer employed by DOC and assigned to GMDC's 4 upper A. She is named here in her official and individual capacities.

18.     Defendant Grinkley was at all times material herein a correction officer employed by DOC and assigned to GMDC's 4 upper A. She is named here in her official and individual capacities.

19.     Defendant Tretjen was at all times material herein a correction officer employed by DOC and was, upon information and belief, assigned to the Central Intake/Classification Unit. Defendant Tretjen is named here in his/her official and individual capacities.

20.     Defendant Freire was at all times material herein a correction officer employed by DOC and was, upon information and belief, assigned to the Intelligence Unit. Defendant Freire is named here in his official and individual capacities.

21.     At all times material to this Complaint, the aforementioned individual defendants acted toward plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York.

FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

22.     On or about April 24, 2012, plaintiff was arrested in connection with a domestic incident involving him and his ex-wife.

23.     Following his arraignment, plaintiff was detained at one of the jails in Rikers Island Correctional Facility ("Rikers").

24.     Eventually, on or about July 7, 2012, plaintiff was transferred from Otis Bantum Correctional Center (OBCC) to GMDC, both of which are jails located on Rikers.

25.     From July 7, 2012 to July 15, 2012, at approximately 4:30 p.m., plaintiff was detained by defendants at GMDC 4 upper as a pretrial detainee awaiting trial.

26.     At all times material to this Complaint, defendant City owned, controlled, managed and operated Rikers.

27.     Upon information and belief, the named individual defendants regularly engage inmates and/or prisoners detained at GMDC and the other jails at Rikers who are members of Bloods to assault other inmates as a way to control and/or manage GMDC and the other jails.

28.     Essentially, defendants turned over the responsibility of managing GMDC and the other jails to Bloods members.

29.     According to U.S. Department of Justice ("DOJ"), Bloods was founded as a prison gang in 1993 at GMDC. *See* Drugs and Crime, Gang Profile, at 1, http://cryptome.org/gangs/united.pdf (last visited June 2, 2015).

30.     Members of the Bloods are involved in several criminal activities including, but not limited to, drug distribution, assault and robbery. *See* Drugs and Crime, Gang Profile, at 1, http://cryptome.org/gangs/bloods.pdf (last visited June 2, 2015).

31.     They are one of the largest street gangs in New York City. *See* http://en.wikipedia.org/wiki/United_Blood_Nation (last visited June 2, 2015).

32.     In exchange for managing GMDC and the other jails, and essentially for doing defendants' work, correction officers assigned to GMDC including, upon information and belief, defendants Laboriel, O'Connell, Beltz, Skepple, James and Grinkley routinely allow inmates who are Bloods members to

have free rein to, among other things, control chairs, telephones and common areas of GMDC.

33.     Upon information and belief, correction officers assigned to the other jails at Rikers also routinely allow Bloods members free rein at those other jails to, among other things, control chairs, telephones and common areas of the jails.

34.     As a result, Bloods members routinely appropriate and maintain exclusive use of the aforementioned utilities and/or common areas including, but not limited to, chairs and dayrooms, and would readily assault any non Bloods inmate who attempts to use any such property or common areas.

35.     In addition to allowing Bloods free rein and control over properties and common areas of GMDC and the other jails, the individual defendants routinely sanction, ignore, protect and cover up the unlawful, abusive and gang related violence and activities of the Bloods.

36.     Essentially, the named individual defendants, including the Commissioner, the senior and/or supervisory officials and the correction officers, acquiesce in and enable the unlawful, abusive and gang related violence and activities of the Bloods.

37.     Upon information and belief, several correction officers assigned to Rikers, including the named individual defendants, fraternize with Bloods members, engage in sexual relations with them, sell drugs to them, sell drugs for them, smuggle drugs and other contrabands to them, and help them broker drug deals and other illicit transactions outside of prison.

38.     Because defendants turned over the responsibility of managing GMDC and the other jails to Bloods members, major violence indicators have been increasing steadily at Rikers. *See* Violence in New York City Jails: Slashing and Stabbing Incidents, at 1, http://www.nyc.gov/html/boc/downloads/pdf/reports/Slashings_stabbings_C RP_2015_04_27_FINAL.pdf (last visited June 2, 2015).

39.     For the period beginning from 2009 to 2014, serious injuries to inmates from fights and inmate assaults were up 68.4%. *See* Violence in New York City Jails: Slashing and Stabbing Incidents, at 1.

40.     As noted above, defendant Ponte is fully aware of the abusive and gang related violence and activities of the Bloods at Rikers, including GMDC.

41.     At all times relevant to this Complaint, defendant Ponte and the other named individual defendants were fully aware of the propensity of members of the Bloods to commit violent acts against non-Blood inmates, such as plaintiff, at Rikers, including GMDC.

42.     As defendant Ponte concedes in his December 19, 2014 prepared statement before the New York City Board of Correction, DOC has "a crisis of violence in the jails". ESH Public Comment, at 7, http://www.nyc.gov/html/boc/downloads/pdf/Variance_Comments/RuleMak ing_201412/Commissioner%20Ponte%27s%20ESH%20Statement_12-19%20BOC%20Pubic%20Hearing_FINAL_PFD.pdf (last visited June 2, 2015).

43.     As defendant Ponte further concedes, high custody inmates accounted for 61% of violent incidents in 2014, while gang members who make up approximately 15% of Rikers' Average Daily Population account for 25% of its most violent incidents. *Id.*

44.     Despite having full knowledge of the aforementioned violent conditions at Rikers, defendant Ponte has failed to take any actions to wrestle control of Rikers, including GMDC, from the Bloods and other street gangs, and has failed to take any concrete actions to end the abusive and gang related violence and activities of the Bloods at Rikers, including GMDC.

45.     Because they are essentially licensed by the individual defendants to run GMDC and operate freely, and relying on their relationship with the individual defendants and the enormous authority conferred upon them by the individual defendants, members of the Bloods targeted and viciously assaulted the plaintiff.

46.     Specifically, on July 15, 2012, at approximately 4:30 p.m., plaintiff was viciously attacked and assaulted at GMDC 4 upper by four (4) inmates who, upon information and belief, are well known members of the Bloods.

47.     Prior to the assault, plaintiff had entered GMDC's 4 upper dayroom near the telephone area and sat down on a chair that is located therein.

48.     The moment the plaintiff sat down on the chair, he was approached by the aforesaid Bloods members who ordered him to get up and indicated that the plaintiff was not authorized to sit on the chair claiming that the chair belonged to Bloods.

49.     When the plaintiff inquired as to the reason why he couldn't sit on the chair, he was viciously attacked and assaulted by the four (4) members of the Bloods.

50.     Plaintiff sustained, among other injuries, a fracture to his right ankle and a broken jaw from the assault which lasted for approximately twenty (20) minutes.

51.     Plaintiff was rendered unconscious as a result of the assault.

52.     Upon information and belief, defendants James and Grinkley witnessed the assault.

53.     In accordance with their aforesaid policy, practice and procedure, the individual defendants sanctioned, aided and/or enabled the assault perpetrated upon the plaintiff by the four (4) members of the Bloods.

54.     As the assault went on for approximately twenty (20) minutes, defendants James and Grinkley merely stood idly by and watched, refused to take any actions to ensure the safety of the plaintiff and did not call for aid nor intervene to protect the plaintiff until after the plaintiff had been battered and severely wounded.

55.     Following the assault, and after the plaintiff regained consciousness, plaintiff questioned defendant James as to the reason why she refused to take any actions to protect him from the assault by the Bloods.

56.     Eventually, the probe team arrived at the location.

57.     The Bloods members who assaulted the plaintiff had already left the location at the time when the probe team arrived.

58.    Upon the arrival of the probe team, plaintiff promptly complained to defendant Rudolph that he was viciously attacked and assaulted by four (4) members of the Bloods in the presence of defendant James.

59.    Plaintiff further complained that defendant James failed to take any actions to protect him and that he would like to know the reason why defendant James did not take any actions to protect him from the assault by the four (4) members of the Bloods.

60.    Because the plaintiff was newly transferred from OBCC to GMDC on July 7, 2012, approximately one (1) week prior to the assault, he was not familiar with any inmates housed at GMDC and did not know the identity of the four (4) members of the Bloods who had attacked him.

61.    As a result, plaintiff requested defendants Rudolph and James to help identity the four (4) members of the Bloods who had attacked him and indicated that he would like to press charges against his assailants and against defendant James.

62.    To cover up the incident, and in retaliation for the plaintiff's complaint against her, defendant James in what appears to be her own handwriting prepared and signed a false incident report dated July 15, 2012, wherein she stated that she observed the plaintiff and another inmate who she identified as Devon Taylor engaged "in a physical altercation [and] were throwing punches with close fist toward each other upper body and facial area."

63.    According to defendant James, she allegedly "issued several direct orders" to end the fight but her orders were ignored.

64.    However, defendant James continued, the moment she warned that she would spray Oleoresin Capsicum ("OC"), plaintiff and Taylor allegedly complied and ended the fight.

65.    Defendant James noted in her incident report that defendant Grinkley witnessed the incident.

66.    While defendant James did also note in her incident report that the plaintiff was escorted out of the location of the alleged fight to another location to

67.     Defendant James did however state in her report that "[b]oth inmates escorted out of area without further incident[]", and that defendant Skepple was notified and "[i]njury report and infractions generated."

68.     As noted above, however, the plaintiff did not observe any of the Bloods members who assaulted him after he regained consciousness and none of the Bloods members were at the location at the time when the probe time arrived.

69.     It appears that a similar false incident report dated July 15, 2012, bearing what appears to be defendant Grinkley's signature, was also prepared by defendant James as the handwriting on the second incident report looks exactly the same as defendant James' handwritten incident report.

70.     As defendant James noted in her false incident report, defendant Grinkley in the false incident report prepared for her by defendant James acknowledged that she witnessed the incident.

71.     In the injury reports prepared for both the plaintiff and Taylor, which appear to bear yet another version of defendant Grinkley's signature, defendant Grinkley however indicated that she did not "witness" any injuries.

72.     In the lower portion of the injury report allegedly prepared by defendant Grinkley for the plaintiff, which was completed by David Kerrison, M.D., of GMDC's medical clinic, Dr. Kerrison who saw the plaintiff on July 15, 2012, at approximately 5:24 p.m., noted that the plaintiff sustained visible injuries including "[] C spine tenderness, [] upper & lower lip swelling, [left] upper lip laceration with scant bleeding, [left & right] jaw tenderness, [right] ankle swelling/tenderness/unable to move due to pain".

73.     The Emergency Medical Services (EMS) personnel who transported the plaintiff on July 15, 2012, at approximately 6:15 p.m., from GMDC's medical clinic to East Elmhurst Hospital Center also noted in their Ambulance Call Report that the plaintiff sustained visible injuries including,

but not limited to, right ankle fracture with obvious swelling, facial abrasions and split lower lips.

74.     The fact that the plaintiff was visibly bruised and battered after the assault by the four (4) members of the Bloods but defendant Grinkley who allegedly witnessed the incident did not "witness" any injuries coupled with the fact that incident reports allegedly filed by defendants James and Grinkley were handwritten by the same individual clearly indicate that defendants James and Grinkley's reports are false.

75.     Aside from defendants James and Grinkley, the other named individual defendants, particularly defendants Rudolph, Skepple and Beltz, also filed various false reports.

76.     As noted above, plaintiff promptly complained to defendant Rudolph that he was viciously attacked and assaulted by four (4) members of the Bloods in the presence of defendant James who failed to take any actions to protect him, and that he would like to press charges against defendant James and the four (4) members of the Bloods.

77.     Notwithstanding the above, defendant Rudolph colluded with defendants James, Grinkley and Skepple, and subsequently filed a belated false incident report dated July 23, 2012, approximately 8 days after the incident.

78.     Defendant Rudolph falsely stated in his incident report that he was informed by the plaintiff on July 15, 2012, when he responded to the incident location with the probe team, that he -- the plaintiff -- was involved in a fight with one (1) other inmate.

79.     Upon information and belief, defendant Rudolph's belated false incident report was prepared by defendants to counter the plaintiff's handwritten complaint dated July 20, 2012, which was witnessed by defendant Freire, wherein the plaintiff maintained that he was viciously attacked and assaulted by four (4) members of the Bloods in the presence of defendant James who failed to take any actions to protect him and that he would like to press charges against defendant James and the Bloods gang members.

80.     Due to the severity of his injuries, and the fact that he was hospitalized shortly after the assault -- first at East Elmhurst Hospital Center and subsequently at Bellevue Hospital Center -- plaintiff was unable to provide any written statement at any time prior to July 20, 2012.

81.     Even worse than defendant Rudolph's belated false incident report, on September 18, 2012, the plaintiff met with defendant Rudolph and completed an application for protective custody.

82.     Plaintiff was genuinely concerned about his safety and worried that the Bloods would target and freely assault him yet again without suffering any consequences.

83.     In addition to the other forms and documents completed, plaintiff provided a handwritten voluntary statement dated September 18, 2012.

84.     In addition to other things, plaintiff clearly stated in his voluntary statement that "[o]n July 15, 2012 I was attacked and assaulted by 4 blood gang members here in G.M.D.C. 4 upper. . . . The 4 inmates beat me up over a chair."

85.     Defendant Rudolph countersigned the plaintiff's statement as a witness and duly acknowledged that the statement was made in his presence.

86.     On the same day, September 18, 2012, defendant Rudolph prepared an initial placement into protective custody housing form dated September 18, 2012.

87.     Defendant Rudolph turned 180 degrees and stated in his said form that, among other things, he was informed by the plaintiff on September 18, 2012, that he -- the plaintiff -- was involved in an altercation with another inmate who is "a known/influential blood and now fears for his life."

88.     As noted above, plaintiff does not know the identity of the individuals who assaulted him and did not inform defendant Rudolph that he was involved in any fight or altercation with any individual.

89.     Notably, DOJ recently concluded in its report of investigations ("report") into the conditions of confinement at Rikers dated August 4, 2014, pertaining to its multi-year civil investigation of defendants in accordance with the Civil Rights of Institutionalized Persons Act ("CRIPA"), that there is a

pattern in incident or use of force reports submitted by DOC correction officers which "strongly suggest [DOC] staff engage in false reporting." SDNY Rikers Report, at 25, http://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-finds-pattern-and-practice-excessive-force-and-violence-nyc-jails (last visited June 2, 2015).

90.     One of the patterns identified by DOJ in its report pertains to incident or use of force reports "submitted by multiple officers regarding the same incident in which similar or even identical language is used to describe the incident." SDNY Rikers Report, at 26 ¶ 4.

91.     According to DOJ, "[t]his pattern suggests collusion among officers to tell a particular story and/or to cover up the actual facts of a particular incident." *Id.*

92.     Although the DOJ investigations was focused on adolescent population at Rikers, it clearly noted in the report that its "investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers." *Id.* at 3.

93.     In addition, although the DOJ investigation was focused on DOC staff use of force, DOJ clearly noted in the report that "inmates are not adequately protected from harm caused by violence inflicted by other inmates . . . [and] a deep-seated culture of violence is pervasive . . . at Rikers. *Id.*

94.     The DOJ report is spot on.

95.     Clearly, defendants James, Grinkley and Rudolph's reports are false and were prepared to, among other things, retaliate against the plaintiff and cover up the actual facts of the assault perpetrated against the plaintiff by four (4) members of the Bloods in the presence of defendant James who failed to take any actions to protect the plaintiff.

96.     In retaliation for the plaintiff's complaint against defendant James, and to cover up the actual facts of the assault perpetrated against the plaintiff by four (4) members of the Bloods in the presence of defendant James who failed to take any actions to protect the plaintiff, defendant James colluded

with defendants Skepple and Grinkley to prepare a false misbehavior report and/or report and notice of infraction dated July 15, 2012.

97.     Defendant James in her false misbehavior report repeated the information contained in her false incident report.

98.     Essentially, defendant James stated in her false misbehavior report that she observed the plaintiff engage "in a fist fight" with Taylor with "both inmates throwing punches with closed fists toward each other facial and upper body area. Several Direct order[s] were given to stop fighting they did not comply. PBA # 35 was activated. Inmates were warned if they didn't stop fighting O.C[.] will be utilized. Both inmate[s] complied[.] Inmate Brown, Shone B/C 1411205504 was escorted to Bridge area[] awaiting on the arrival of the probe team. Both [i]nmates [e]scorted with no further incident."

99.     Defendant James did not activate her PBA # 35 until after the plaintiff had been battered and severely wounded.

100.    Defendant James in her false misbehavior report charged plaintiff with 120.10 "Refusal to obey direct order" and 101.14 "Fighting w/injury."

101.    Plaintiff however was attacked and assaulted by four (4) members of the Bloods in the presence of defendant James who failed to take any actions to protect the plaintiff.

102.    Plaintiff, as supported by his contemporaneous medical treatment records, was viciously battered and rendered unconscious by the assault.

103.    Given his condition, plaintiff could not have engaged in any fighting with any individual and could not have ignored any orders to end any fighting as he could not have heard any such orders.

104.    It appears that defendant James also issued a similar misbehavior report with similar charges to Taylor.

105.    Upon information and belief, defendant Skepple was defendants James and Grinkley's tour supervisor and was assigned by the tour commander, defendant Beltz, to investigate the July 15, 2012, incident.

106.    Defendant Skepple did not conduct any investigations.

107.    Notwithstanding the above, defendant Skepple proceeded to file a false incident report dated July 30, 2012, basically corroborating defendants James, Grinkley and Rudolph's false reports.

108.    Even though defendant Skepple did not interview the plaintiff on July, 15, 2012, and did not ask the plaintiff to provide any statement -- verbal or written -- at anytime, defendant Skepple proceeded to falsely allege in his false incident report that he "questioned" the plaintiff on July 15, 2012, while he was awaiting treatment at GMDC clinic but the plaintiff refused to provide . . . a statement or provide . . . any information as to how he got hurt or about the physical altercation with inmate Taylor."

109.    In addition, defendant Skepple falsely alleged in his false incident report that he "counseled" the plaintiff that fighting will not be tolerated on DOC premises and that the plaintiff will be "infracted" for violating DOC's "Rules of conduct for the charges of 120.10/Refusing to obey a direct order to stop fighting and 101.14/Fighting that results in injury."

110.    After stating in his said report that "Taylor was infracted in AMKC on July 19, 2012, at approximately 11:55 p.m., defendant Skepple went on to falsely allege that he personally served the plaintiff with defendant James' false misbehavior report or notice of infraction on July 20, 2012, at approximately 7:35 a.m.

111.    In addition to other things, defendant Skepple falsely alleged in his false incident report that after he served the plaintiff with defendant James' false misbehavior report, plaintiff refused to sign and take his copy.

112.    Defendant Skepple continued that after he served the plaintiff with defendant James' false misbehavior report, plaintiff then submitted his aforementioned handwritten complaint to defendant Freire and "claim[ed]" in his statement that he was viciously attacked and assaulted by four (4) members of the Bloods, and that he informed defendant Rudolph on July 15, 2012, when he responded to the location of the assault with the probe team, that he was viciously attacked and assaulted by four (4) members of the Bloods.

113.    Relying upon the false reports allegedly filed by defendants James, Grinkley and Rudolph, and without interviewing the plaintiff concerning the incident, defendant Skepple concluded that "[t]there were no other inmates [besides Taylor] involved."

114.    Defendant Skepple did not stop at that, however.

115.    Defendant Skepple went on to falsely accuse the plaintiff of fabricating his July 20, 2012, statement to defendant Freire.

116.    Defendant Skepple falsely alleged that the plaintiff's motive for providing his statement to defendant Freire that he was viciously attacked and assaulted by four (4) members of the Bloods was "from a direct result of being infracted at 0735 hours at N.I.C. and then attempting to establish himself as a victim of the incident so that he is not penalized for violating any inmate rules regarding conduct in fighting."

117.    Defendant Skepple also falsely alleged that the plaintiff may have been motivated in providing his statement to defendant Freire that he was viciously attacked and assaulted by four (4) members of the Bloods due to what defendant Freire described as "self-motivated and financial, in-case [plaintiff] attempts to sue the department for his injuries, although he was clearly injured due to his own negligence and due to his participation in one on one physical fight with [] Taylor."

118.    Defendant Skepple concluded that the plaintiff engaged in a physical one on one fight with Taylor and that "an assault did not occur."

119.    Defendant Skepple determined that the "motive of the fight is believed to be horse-playing which turned into a physical altercation, based on D.O.C. Intelligence."

120.    Defendant Skepple praised defendant James for her "quick and accurate response", exonerated defendant James of any wrongdoing, refused to refer the plaintiff's complaint against defendant James to the Inspector General's Office, Board of Correction or Department of Investigation, refused to identify the four (4) members of the Bloods who attacked and assaulted the

plaintiff, and summarily dismissed plaintiff's complaint against defendant James and the gang members.

121.     Although defendant Skepple included a language disclaiming responsibility for any information that is unknown, incomplete or false, he did conclude that the "serious injur[ies] sustained [by plaintiff] derived as a direct result of his physical fight with [Taylor] and are consistent with all staff eye-witness accounts, staff reports, medical documentation, and my full and thorough investigation."

122.     Notably, the underlying incident occurred on July 15, 2012.

123.     Defendant Skepple claimed that he personally served defendant James' false misbehavior reports upon Taylor and the plaintiff on July 19, 2012 and July 20, 2012, respectively.

124.     In essence, according to defendant Skepple, defendant James' false misbehavior reports were served after three (3) and four (4) business days had elapsed.

125.     Pursuant to section III(A)(3) of DOC's Classification # 6500R-B, any misbehavior report "shall be served upon the inmate . . . no later than three (3) business days after the incident."

126.     Defendant Skepple did not provide any reason why he did not serve the misbehavior report upon Taylor within the mandated (3) business days.

127.     In addition, pursuant to section III(A)(6) of DOC's Classification # 6500R-B, an inmate is required to sign any misbehavior report as proof of receipt.

128.     If the inmate refuses to sign the misbehavior report, any "staff member other than the person serving the Notice must note the inmate's refusal on the Notice and include his/her name and shield number legibly."

129.     Other than defendant Skepple stating in his false reports that he allegedly served the misbehavior reports upon the plaintiff and Taylor, and that they both refused to sign the misbehavior reports, no staff member noted any refusal by plaintiff and Taylor to sign the misbehavior reports in accordance with section III(A)(6) of DOC's Classification # 6500R-B.

130.    Regarding "medical documentation", defendant Skepple indicated in his false incident report that he reviewed the plaintiff's medical records from GMDC's medical clinic, East Elmhurst Hospital Center and Bellevue Hospital Center.

131.    With regard to plaintiff's medical records from GMDC's medical clinic, Dr. Kerrison noted in his medical reports that the plaintiff's injuries were caused by "DOC use of force/alleged attack by staff", and that the plaintiff did lose consciousness and was dazed and confused as a result of his injuries.

132.    Because of the severity of his injuries, plaintiff was promptly transferred from GMDC's medical clinic to East Elmhurst Hospital Center.

133.    Because plaintiff's injuries were too severe for the doctors there to treat, plaintiff was transferred yet again to Bellevue Hospital Center.

134.    Plaintiff was subsequently seen by Salil Gupta, M.D. and Budd M. Hyman, M.D. at Bellevue Hospital Center on or about July 17, 2012, who noted in their medical report dated July 17, 2012, that the plaintiff "was attacked by a gang of inmates at Rikers this past weekend[]", was punched in the head by the gang members and was unconscious and sustained, in addition to other injuries, right ankle fracture.

135.    It appears that Dr. Kerrison also saw Taylor on July 15, 2012, at approximately 7:42 p.m. Dr. Kerrison noted that Taylor did not sustain any visible injuries, denied any injuries, had no complaints and did not need any treatment.

136.    It does not appear from the photos of Taylor allegedly taken by defendants after the incident on July 15, 2012, that Taylor sustained any injuries.

137.    More importantly, Taylor indicated that he was removed from his cell by defendants at sometime after the incident, and that he was subsequently questioned by defendants concerning the incident.

138.    Taylor categorically denied any involvement in any fight.

139.    Notably, the plaintiff, who is 44 years old, is approximately 5 feet 9 inches tall and weighs approximately 180 pounds.

140.     Upon information and belief, Taylor is approximately 34 years old, weighs approximately 140 pounds and is approximately 5 feet 7 inches tall.

141.     According to defendants James and Grinkley's false reports, they observed the plaintiff and Taylor "throwing punches with closed fists toward each other facial and upper body area."

142.     As noted above, the plaintiff, in addition to other serious injuries, sustained a serious ankle fracture requiring open reduction internal fixation (ORIF) surgery. "'Open reduction' means surgery is needed to realign the bone fracture into the normal position. 'Internal fixation' refers to the steel rods, screws, or plates used to keep the bone fracture stable in order to heal the right way and to help prevent infection." ORIF (Open Reduction Internal Fixation) Surgery, http://www.orthopaedics.com.sg/treatments/screw-fixation (last visited June 2, 2015).

143.     Plaintiff's medical records show that his treating physicians during the surgery placed several objects in his ankle including, but not limited to, 7-hole plate, k-wires and several screws in order to help realign his ankle to ensure proper healing.

144.     Plaintiff was confined to a wheelchair for several months after the surgery.

145.     Given that the plaintiff was visibly battered and sustained serious injuries over his entire body, no reasonable person could conclude that the "serious injury sustained [by plaintiff] derived as a direct result of his physical fight with [Taylor] and are consistent with all . . . medical documentation . . . ."

146.     It is not possible for Taylor, who weighs a lot less than the plaintiff, to inflict that amount of injury on the heavier and physically fit plaintiff in the amount of time claimed by defendants without sustaining any injury -- not even a minor bruise, bump, scratch or cut -- on any part of his body.

147.     Moreover, as noted above, defendants James and Grinkley's merely reported that they allegedly observed the plaintiff and Taylor "throwing punches with closed fists toward each other facial and upper body area."

148.     As DOJ concluded in the report, DOC "investigations are grossly inadequate." SDNY Rikers Report, at 29(1).

149.    According to DOJ, DOC too frequently hold fast to its false and grossly inadequate investigation reports and/or account of incidents even when medical records and/or other evidence do not support its story. *Id.* at 29, 32.

150.    Not surprisingly, defendants Laboriel, O'Connell and Beltz all concurred with defendants James, Grinkley, Rudolph and Skepple and signed off on their false reports.

151.    Defendants Laboriel, O'Connell and Beltz praised staff for responding quickly to the incident, quickly concluded that staff were in compliance with DOC's policies, exonerated defendant James of any wrongdoing, refused to refer the plaintiff's complaint against defendant James to the Inspector General's Office, Board of Correction or Department of Investigation, refused to identify the four (4) members of the Bloods who attacked and assaulted the plaintiff, and summarily dismissed plaintiff's complaint against defendant James and the gang members.

152.    Defendant Beltz even went further to misrepresent the record in his tour commander's incident report dated July 30, 2012.

153.    While defendant James was clear in her false reports that she allegedly observed the plaintiff and Taylor "throwing punches with closed fists toward each other facial and upper body area", defendant Beltz falsely alleged in his incident report that his investigations revealed that defendant James allegedly observed the plaintiff and Taylor "throwing punches towards each others facial and *bodily* areas." (Emphasis added.)

154.    Defendant Beltz also falsely observed in his aforesaid incident report that the plaintiff and Taylor prior to allegedly fighting with each other were "horse playing when it turned serious."

155.    Defendant Beltz continued that his investigations revealed that the plaintiff and Taylor were allegedly "separated and taken to the main intake."

156.    Notably, nothing in any of the false reports filed by defendants James, Grinkley, Rudolph and Skepple indicate that the plaintiff was "taken to the main intake."

157.     While defendants Laboriel, O'Connell, Beltz and Skepple were quick to applaud defendants James and Grinkley, and approved of defendant James' false misbehavior report, they failed to take any action to ensure that a hearing was held to adjudge the false misbehavior report.

158.     Pursuant to section III(C)(2) of DOC's Classification # 6500R-B, a hearing "must take place within three (3) business days of service of the Report and Notice of Infraction on the inmate".

159.     Upon information and belief, no such hearing has been held in connection with defendant James' false misbehavior report allegedly served upon the plaintiff by defendant Skepple on July 20, 2012.

160.     Pursuant to sections III(C)(5) and (III)(C)(38)(a) of DOC's Classification # 6500R-B, providing for disposition of misbehavior reports, any misbehavior report could only be disposed of by a finding of guilt or innocence on each charge after a hearing or by a dismissal by an adjudication captain prior to a hearing based solely on due process violations. Pursuant to section III(C)(5) of DOC's Classification # 6500R-B, any dismissal based solely on due process violations is not considered a dismissal on the merits.

161.     Presently, defendant James' false charges against the plaintiff for alleged violation of 120.10 "Refusal to obey direct order" and 101.14 "Fighting w/injury" remain in plaintiff's inmate file/records.

162.     Defendants Laboriel, O'Connell, Beltz and Skepple's determination that the plaintiff was guilty as charged by defendant James for alleged violation of 120.10 "Refusal to obey direct order" and 101.14 "Fighting w/injury" remain in plaintiff's inmate file/records.

163.     Even though the plaintiff continues to maintain that he is innocent, defendants, upon information and belief, have refused to provide him with a hearing or dismiss the false charges against him on the grounds that the charges were manufactured by defendants James and Skepple.

164.     Upon information and belief, defendants subsequently relied upon defendant James' false misbehavior report in maintaining the plaintiff's maximum

custody level classification thereby depriving him of several benefits available to an inmate with lower custody level classification.

165. As noted above, defendants have refused to identify the four (4) members of the Bloods who attacked and assaulted the plaintiff.

166. When the plaintiff met with defendant Freire on July 20, 2012, defendant Freire informed the plaintiff that he would assemble and show the plaintiff a photo array of inmates housed at GMDC on July 15, 2012, at approximately 4:30 p.m., when the incident occurred.

167. In addition, defendant Freire informed the plaintiff that he would investigate to find out the status of plaintiff's complaints against defendant James and the four (4) members of the Bloods who attacked and assaulted the plaintiff and promised to assist the plaintiff in pressing charges against said individuals.

168. Upon information and belief, defendant Freire, following his meeting with the plaintiff, met with defendants James, Grinkley and Skepple.

169. During this meeting, defendants James, Grinkley and Skepple indicated that the plaintiff must not be shown or allowed to view any photo array to identify the four (4) members of the Bloods who attacked and assaulted the plaintiff and that they were working in cahoots with defendants Laboriel, O'Connell, Beltz and Rudolph to cover up the actual facts of the incident.

170. Because defendant Freire agreed to work in cahoots with Laboriel, O'Connell, Beltz, Rudolph James, Grinkley and Skepple to cover up the actual facts of the incident, he then changed his mind and refused to show the plaintiff any photo array.

171. Additionally, defendant Freire refused to meet with the plaintiff or provide the plaintiff with any update concerning the status of his complaint against defendant James and the four (4) members of the Bloods who attacked and assaulted the plaintiff, and refused to assist the plaintiff in bringing claims against said individuals for, among other things, assault and battery.

172. Because defendants have refused to identify the four (4) members of the Bloods who attacked and assaulted the plaintiff, and have refused to show

the plaintiff any photo array to help him identify said individuals or assist the plaintiff in any other way to identify said individuals, none of the gang members has been identified.

173.   Because the one year statute of limitations for assault and battery claims had long expired, and given that it is nearly three (3) years since the horrific assault upon the plaintiff by the four (4) members of the Bloods, plaintiff will no longer be able to bring or maintain any claim against said individuals for, among other things, assault and battery and negligent and intentional infliction of emotional distress.

174.   Regarding Taylor, who was identified by defendants as the individual who was allegedly engaged in a fist fight with the plaintiff, upon information and belief, no hearing has been held in the matter against him concerning defendant James' false misbehavior report which was allegedly served upon Taylor by defendant Skepple on July 19, 2012.

175.   Upon information and belief, defendants have yet to take any disciplinary actions against Taylor for his alleged violation of 120.10 "Refusal to obey direct order" and 101.14 "Fighting w/injury.

176.   As defendants Beltz, Skepple and Rudolph confirmed in their false reports, Taylor is an influential and well known member of the Bloods.

177.   Upon information and belief, Taylor has a lengthy rap sheet and has had numerous prior stays at Rikers.

178.   Taylor has a violent history, and, upon information and belief, has been involved in numerous fights and slashings at Rikers.

179.   On April 1, 2011, Taylor shot Julio Lora in the head during a robbery attempt. *See* Charges filed in livery cab shooting in the Bronx, http://abclocal.go.com/story?section=news/local/new_york&id=8046176 (last visited June 2, 2015).

180.   Immediately after the shooting, Taylor left his gun in Lora's cab and walked up the street and attempted to rob an elderly woman. *See* Cab driver left quadriplegic after shooting, http://www.jitneyhack.com/2011/04/cab-driver-left-quadriplegic-after-shooting/category/taxi/taxi-taxi.html (last visited June

2, 2015); Bronx livery driver critical after being shot by passenger, http://nypost.com/2011/04/01/bx-livery-driver-critical-after-being-shot-by-passenger/ (last visited June 2, 2015).

181.     Taylor then tried to run away, but was chased down and eventually apprehended and subdued by some Good Samaritans who restrained him until police arrived. *See* Charges filed in livery cab shooting in the Bronx, http://abclocal.go.com/story?section=news/local/new_york&id=8046176 (last visited June 2, 2015).

182.     Following his arrest, Taylor attempted suicide and was rushed to Bellevue Hospital Center for psychiatric evaluation and treatment. *Id.*

183.     Since April 1, 2011 to the present, Taylor has been incarcerated at Rikers awaiting trial for killing Lora. *See* NYC Department of Correction, Inmate Lookup Service, http://a073-ils-web.nyc.gov/inmatelookup/pages/common/find.jsf (last visited June 2, 2015).

184.     To the extent defendants claim that the plaintiff's injuries were caused by Taylor, it is clear from Taylor's violent and emotional history that Taylor did not belong in GMDC's general population where the plaintiff was housed on July 15, 2012.

185.     In fact, Taylor was not screened for risk assessment by defendants prior to his admission or placement in GMDC. Upon information and belief, defendant City, acting through DOC, had actual and/or de facto policies, practices, customs and/or usages of not screening certain incoming detainees.

186.     Even worse, there is no indication that Taylor, who was widely reported by national news media outlets to have attempted suicide following his arrest, was cleared by medical staff for housing nor was he evaluated by any psychiatrist and cleared for placement in general population.

187.     Notably, defendant Tretjen who completed Taylor's Arraignment and Classification Risk Screening Form ("screening form") failed to obtain and include Taylor's social security number and failed to screen Taylor for his Bloods gang membership.

188.    In addition, defendant Suprenant who, upon information and belief, signed the screening form as the receiving facility supervisor and was responsible for Taylor's initial placement, failed to consider Taylor's gang membership, criminal, medical and psychological history in placing Taylor to a housing area in violation of the New York State Commission of Correction Minimum Standards and Regulations for Management of County Jails and Penitentiaries (9 NYCRR § 7013.8).

189.    Further, defendant Suprenant failed to assign Taylor any custody level classification which "is critical to appropriate placement of inmates, facilitating the efficient and effective operating of the correctional system." Memorandum Report to the Legislature, Inmate Classification and Placement, at 17, https://www.ncjrs.gov/pdffiles1/Digitization/131504NCJRS.pdf (last visited June 2, 2015).

190.    Upon information and belief, defendant City, acting through DOC, had a policy in place of designating Bloods members as members of a Security Risk Group ("SRG").

191.    Upon information and belief, SRG designation indicates that the designated Bloods inmate posed a substantial risk to any non-Bloods inmates, such as the plaintiff.

192.    Even though defendants were fully aware that Taylor is an influential and well known Bloods member, defendants Suprenant, Tretjen and the other named defendants failed to assign SRG designation to Taylor.

193.    Upon information and belief, Bloods members did also perpetrate a similar violent assault upon another inmate at GMDC 4 upper a few days prior to the July 15, 2012, assault upon the plaintiff.

194.    The defendants negligently placed the plaintiff in GMDC 4 upper location despite knowledge that GMDC 4 upper had a violent environment and a history of inmate on inmate assaults.

195.    The defendants failed to place the plaintiff in a jail where he was safe from predatory arrestees and gang members.

196.      Defendants Laboriel, O'Connell, Beltz and Skepple, in their respective positions as Acting Warden, Deputy Warden, Assistant Deputy Warden and Supervising Captain  of GMDC, had responsibility for the protection of inmates in GMDC, including the plaintiff.

197.      Defendants Laboriel, O'Connell, Beltz and Skepple were aware of "the crisis of violence" in GMDC, the abusive and gang related violence and activities of the Bloods and the collusion between staff and Bloods members.

198.      Despite having full knowledge of the aforementioned violent conditions at GMDC, Laboriel, O'Connell, Beltz and Skepple failed to take any actions to wrestle control of GMDC from the Bloods and other street gangs, and failed to take actions to end the abusive and gang related violence and activities of the Bloods at GMDC.

199.      The defendants negligently placed the plaintiff in GMDC 4 upper location despite knowledge that that plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate the harm.

200.      Because of the failures of the individual defendants as described herein, plaintiff sustained the aforementioned serious injuries.

201.      That each and every named individual defendant, including the supervisory officer defendants and the individual defendants who responded to, had any involvement and/or was present at the location of the assault, knew and was fully aware that the plaintiff faced a substantial risk of serious harm and had a realistic opportunity to take actions to prevent the serious harm detailed above from occurring.

202.      Nonetheless, the named individual defendants did absolutely nothing to discourage and prevent the harm detailed above from occurring and failed to protect and ensure the safety of the plaintiff.

203.      As a result of the aforesaid actions by defendants, plaintiff suffered and continues to suffer emotional distress, fear, embarrassment, humiliation, shock, discomfort, loss of liberty, pain and damage, and damage to reputation.

FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 - against Ponte, Suprenant, Laboriel, O'Connell, Beltz, Skepple, James, Grinkley & Tretjen

204.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 203 of this complaint as though fully set forth herein.

205.     The conduct of the individual officers, as described herein, amounted to deliberate indifference to a serious threat to the health or safety, cruel and inhuman treatment, cruel and unusual punishment and denial of due process rights.

206.     Such conduct violated plaintiff's rights under 42 U.S.C. § 1983 and the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

207.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 - against Laboriel, O'Connell, Beltz, Skepple, James, Grinkley & Rudolph

208.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 207 of this complaint as though fully set forth herein.

209.     The conduct of the individual officers, as described herein, amounted to first amendment retaliation and denial of due process rights.

210.     Such conduct violated plaintiff's rights under 42 U.S.C. § 1983 and the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

211.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 - against Laboriel, O'Connell, Beltz, Skepple, James, Grinkley, Rudolph & Freire

212.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 211 of this complaint as though fully set forth herein.

213.     The conduct of the individual officers, as described herein, amounted to conspiracy, denial of equal protection of the laws and denial of due process rights.

214.     Such conduct violated plaintiff's rights under 42 U.S.C. § 1983 and the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

215.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

FOURTH CAUSE OF ACTION: FAILURE TO TRAIN/SUPERVISE/DISCIPLINE AND MUNICIPAL POLICY - against City

216.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 215 of this complaint as though fully set forth herein.

217.     Defendant City, acting through DOC, had actual and/or de facto policies, practices, customs and/or usages of failing to properly train, supervise or discipline its officers concerning objective jail classification of inmates, ensuring that all inmates are both properly classified and housed, proper screening of incoming detainees, fraternization with members of street gangs including but not limited to Bloods, impermissible delegation of duties to Bloods and other street gangs, obligation to timely respond and prevent inmate on inmate assault, protecting inmates from assaultive inmates, providing assistance to inmates, ensuring the safety and well being of inmates, protecting inmates from harm, isolating predatory gang members in jails, provision of medical treatment to inmates, correct practices in conducting investigations, interviewing of witnesses and informants, proper supervision of subordinates, assessment of the credibility of witnesses and informants, obligation not to promote or condone perjury, obligation not to assist in cover ups and/or assist in the prosecution of innocent persons, and the duty and/or obligation of candor toward the court.

218.     Defendant City, acting through aforesaid DOC, had actual and/or de facto policies, practices, customs and/or usages of sanctioning and covering up

inmate on inmate assaults in City jails, including GMDC and promoting violence in City jails, including GMDC, which has led to what DOJ described as an "Extraordinary Frequency of Violence" in City jails, including GMDC. SDNY Rikers Report, at 7.

219.     Further, the existence of the aforesaid unconstitutional policies, practices, customs and/or usages may be inferred from repeated occurrences of similar wrongful conduct.

220.     Notably, DOC staff has a well documented history of failing to take prompt actions to prevent fights and inmate on inmate assaults.

221.     On or about May 1, 2005, a large fight broke out among rival street gangs at GMDC over what appears to be a dispute over rights to a bench that is located in GMDC's main recreation yard. *See Dep't of Correction v. Branch*, at 2, http://archive.citylaw.org/oath/06_Cases/06-902.pdf (last visited June 2, 2015).

222.     Instead of taking immediate action to prevent the fight and take serious disciplinary actions against the gang members, DOC staff encouraged and enabled the fight. *See Dep't of Correction v. Branch*.

223.     As the gang members fought against each other, DOC staff stood idly by and watched the fight. *Id.*

224.     In addition, in or about March 2007, Amir Douglas, a high ranking Bloods member, was convicted of Gang Assault in the first degree and two (2) counts of Assault in the second degree in the fatal beating of Tyreece Abney on October 3, 2004 at GMDC. *See* The New York Times, City Agrees to Pay $850,000 to End Suit Over Inmate's 2004 Beating Death, http://www.nytimes.com/2012/11/24/nyregion/new-york-city-agrees-to-pay-850000-to-settle-suit-over-inmates-death.html?_r=0 (last visited June 2, 2015).

225.     The fatal beating occurred after Correction Officers assigned to GMDC had expressed concern that Mr. Abney was becoming a "discipline problem in the unit." *Id.*

226.     In addition to Douglas, two (2) other Bloods members, Christopher Morales and Adrian Santiago, had earlier plead guilty to Manslaughter in the second degree and Assault in the second degree, respectively, for their roles in the fatal beating of Mr. Abney. *See* Press Release, High Ranking 'Bloods' Gang Member Convicted of Assault in Deadly Beating that Claimed the Life of a Fellow Inmate on Rikers Island, http://bronxda.nyc.gov/information/2007/case13.htm (last visited June 2, 2015).

227.     Prosecutors learned from their investigation into Mr. Abner's death that one of the individuals involved in Mr. Abner's fatal beating had been receiving extra phone and mailing privileges from a correction officer who was also mailing coded messages for said individual. *See* New York Village Voice, What the Jail Guard Saw, Rikers officers encourage gang violence: surprising testimony and the stats to back it up, http://www.villagevoice.com/2007-07-03/news/what-the-jail-guard-saw/full/ (last visited June 2, 2015).

228.     Defendant City subsequently settled an action commenced against it and several of its officers by Mr. Abney's family/estate for approximately $850,000.00.

229.     Another inmate, Christopher Robinson, was also beaten to death on October 28, 2008, by Bloods members.

230.     According to the prosecutors who investigated the fatal beating, Mr. Robinson was assaulted by Bloods members who had been enlisted by correction officers to help maintain rigid control over the unit through an intimidation campaign that is widely known as "the Program." *See* The New York Times, City Pays $2 Million in Case of Inmate Killed at Rikers, http://www.nytimes.com/2012/06/09/nyregion/city-pays-2-million-to-mother-of-inmate-killed-by-other-rikers-island-inmates.html (last visited June 2, 2015).

231.     The prosecutors' investigation also uncovered that Bloods members with the aid of correction officers robbed fellow inmates of money from their inmate

accounts and robbed fellow inmates of several privileges, including but not limited to telephone calls, and even decided who was allowed to enter into the dayroom and use chairs. *See* The New York Times, City Pays $2 Million in Case of Inmate Killed at Rikers.

232.     At least two (2) correction officers, Michael McKie and Khalid Nelson, pleaded guilty to Assault in the second degree and Attempted Assault in the second degree, respectively, in connection with the case. *Id.*

233.     Defendant City subsequently settled an action commenced against it and several of its officers by Mr. Robinson's family/estate for approximately $2,000,000.00. *Id.*

234.     Additionally, on or about June 17, 2010, Correction Officer Lloyd Nicholson was convicted on charges that he ordered Bloods members to assault fellow inmates, and was found guilty of Gang Assault in the second degree and Assault in the second degree. *See* The New York Times, 6-Year Sentence for Guard in Rikers Island Beatings, http://www.nytimes.com/2010/08/07/nyregion/07guard.html (last visited June 2, 2015).

235.     Further, on or about March 8, 2012, Correction Officer Clara Espada who was assigned to GMDC admitted that she was engaged in a sexual relationship over an extended period of time with an inmate at GMDC who, upon information and belief, is a known Bloods member, and that she sold drugs, booze and cigarettes to the inmate. *See* AllMediaNY, Rikers Island Guard Admits to Drug Sales, Bribery, Sex with Inmate, http://www.allmediany.com/news/3526-rikers-island-guard-admits-to-drug-sales-bribery-sex-with-inmate (last visited June 2, 2015).

236.     According to Espada, who pleaded guilty to Bribe receiving in the third degree, the inmate helped Espada broker deals which netted Espada a substantial amount of money over an extended period of time. *Id.*

237.     Prior to Espada's arrest, several correction officers including Teneya Griffith and Clarence Carrier were arrested and charged with various similar offenses including but not limited to promoting prison contraband in the first degree.

*See* gothamist, Rikers Guard Busted for Selling Drugs and Booze to Inmates, http://gothamist.com/2010/01/02/rikers_guard_busted_for_selling_dru.php (last visited June 2, 2015); New York Post, Guard's a drug celler – probers, http://nypost.com/2010/11/14/guards-a-drug-celler-probers/ (last visited June 2, 2015).

238.     In addition to the above, several correction officers including, but not limited to, Eliseo Perez, Jose Parra, Alfred Rivera, Tobias Parker, Michael Pollard, David Rodriguez, Jeffrey Richard, Harmon Frierson, Dwayne Maynard, Gerald Vaughn, Timothy Munroe, Eric Jones, Gary Heyward, Glenda Glenn, Anthony Guzman, Ahmad Abdul Hakim, Cleveland Porter, Carmine LaBruzzo, Victor Rodman, Denise Albright, Michelle Hubert, Daniel DiPierri, Kevin Gilkes, Louis Pinto, Roy Rodney and Winston Gillon were recently charged and/or convicted of various crimes including but not limited to inmate gang assault, offering false instrument for filing, falsifying business records and official misconduct.

239.     The charges against several of the aforementioned officers stem from the fact that the officers sold drugs to inmates, smuggled drugs and other contrabands to inmates, engaged in sexual relationship with inmates, assaulted inmates, witnessed the assault of inmates but failed to protect the inmates, covered up inmate assaults and/or lied about their involvement and/or the facts and circumstances concerning inmate assaults.

240.     A former correction officer, Roger Cullen, had testified at a deposition in an unrelated civil action in this district against defendant City of New York and several of its correction officers, *Donald Jackson v. City of New York* (04 CV 5799). *See* New York Village Voice, What the Jail Guard Saw, Rikers officers encourage gang violence: surprising testimony and the stats to back it up.

241.     In accordance with Mr. Cullen's testimony, defendant City of New York has a widespread, persistent and notorious practice widely known as "write with us", in which correction officers conspire to cover up and make false reports concerning incidents involving inmates including, but not limited to, inmate

242.     Upon information and belief, defendant City of New York has settled numerous lawsuits brought in this district against it and several of its officers concerning inmate gang assaults which were sanctioned, aided, enabled and/or facilitated by its officers and agents as the inmate gang assault involved herein. *See*, *e.g.*, *Donald Jackson v. City of New York* (04 CV 5799), which was settled for $500,000; *Camillo Douglas v. City of New York* (07 CV 7041), which was settled for $230,000; *Carter v. City of New York* (08 CV 5799), which was settled for an undisclosed amount; *Tyreek Shuford v. City of New York* (09 CV 945), which was settled for $375,000; *Alcides Polanco v. City of New York* (09 CV 10131), which was settled for $180,000; *David Plunkett v. City of New York* (10 CV 6778), which was settled for $150,000; *Kadeem John v. City of New York* (11 CV 5610), which was settled for $850,000; *Dwaine Taylor v. City of New York* (12 CV 5881), which was settled for an undisclosed amount; *Ross v. City of New York* (12 CV 8545), defendants' interlocutory appeal pending before Second Circuit Copur of Appeals; *Mani Tafari v. City of New York* (13 CV 1733), which was settled for an undisclosed amount.

243.     That defendant City of New York maintained the above described policies, practices, customs or usages knowing fully well that the policies, practices, customs or usages lead to improper conduct by its police officers and employees. In failing to take any corrective actions, defendant City of New York acted with deliberate indifference, and its failure was a direct and proximate cause of plaintiff's injuries as described herein.

244.     The actions of defendants, acting under color of State law, deprived plaintiff of his due process rights, and rights, remedies, privileges, and immunities under the laws and Constitution of the United States, treatise, ordinances, customary international law and norms, custom and usage of a right; in

particular, the right to be secure in his person and property, to be free from abuse and the use of force and the right to due process.

245.     By these actions, defendants have deprived plaintiff of rights secured by treatise, ordinances, customary international law and norms, custom and usage of a right, and the First, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

<u>FIFTH CAUSE OF ACTION: NEW YORK STATE CONSTITUTION, ARTICLE I, §§ 5, 6, 8 & 11 - against defendants</u>

246.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 245 of this complaint as though fully set forth herein.

247.     By reason of the foregoing, and by conspiring to harass and assault him and deprive him of equal protection of laws, defendants deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I, § 5 (prohibiting cruel and unusual punishments), Article 1, § 6 (providing for due process), Article 1, § 8 (guaranteeing freedom of speech) & Article 1, § 11 (prohibiting discrimination in civil rights and providing for equal protection of laws).

248.     In addition, the individual officers conspired among themselves and conspired with other individuals to deprive plaintiff of his constitutional rights secured by Article I, §§ 5, 6, 8 & 11 of the New York Constitution, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

249.     The individual officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents, or employees. The individual officers' acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. The individual officers acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by Article I, §§ 5, 6, 8 & 11 of the New York Constitution.

250.     Defendants, their officers, agents, servants, and employees were responsible for the deprivation of plaintiff's state constitutional rights.

SIXTH CAUSE OF ACTION: OTHER NEW YORK TORTS - against defendants

251.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 250 of this complaint as though fully set forth herein.

252.     The conduct of the defendants, as described herein, amounted to negligence, assault and battery, and breach of special duty or relationship.

253.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

SEVENTH CAUSE OF ACTION: INTENTIONAL & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

254.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 253 of this complaint as though fully set forth herein.

255.     The defendants engaged in extreme and outrageous conduct, intentionally, negligently and recklessly causing severe emotional distress to plaintiff.

256.     Plaintiff's emotional distress has damaged his personal and professional life because of the severe mental pain and anguish which were inflicted through deliberate and malicious actions.

257.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

EIGHTH CAUSE OF ACTION: NEGLIGENT HIRING AND RETENTION OF EMPLOYMENT SERVICES - against defendant City

258.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 257 inclusive, with the same force and effect as though more fully set forth at length herein.

259.     Upon information and belief, defendant City, through its various agencies and departments including the defendants in this action, owed a duty of care to plaintiff to prevent the physical and mental abuse sustained by plaintiff.

260.     Upon information and belief, defendant City, through its various agencies and departments including the defendants in this action, owed a duty of care to plaintiff because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated that an injury to plaintiff or to those in a like situation would probably result from such conduct described herein.

261.     Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were not prudent and were potentially dangerous.

262.     Upon information and belief, defendant City's negligence in hiring and retaining the individual defendants proximately caused plaintiff's injuries.

WHEREFORE, plaintiff respectfully prays judgment as follows:

a.     For compensatory damages against all defendants in an amount to be proven at trial;

b.     For exemplary and punitive damages against all defendants in an amount to be proven at trial;

c.     For costs of suit herein, including plaintiff's reasonable attorney's fees;

d.     For injunction requiring defendants to expunge defendant James' false misbehavior report dated July 15, 2012, from his inmate/prison record and;

e.     For such other and further relief as the court deems proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury.

Dated: Brooklyn, New York
          June 2, 2015

UGO UZOH, P.C.

/s/

By:    _____
       Ugochukwu Uzoh (UU-9076)
       Attorney for the Plaintiff
       304 Livingston Street, Suite 2R
       Brooklyn, N.Y. 11217
       Tel. No: (718) 874-6045
       Fax No: (718) 576-2685
       Email: u.ugochukwu@yahoo.com