UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/17/17

------------------------------------------------x
      :
SHONE BROWN,      :
      :
      Plaintiff,      :      13-cv-06912
      :
      v.      :      **OPINION**
      :
THE CITY OF NEW YORK, et al.,      :
      :
      Defendants.      :
      :
------------------------------------------------x

THOMAS P. GRIESA, United States District Judge:

      Plaintiff Shone Brown brings this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City") and eleven individuals employed by the New York City Department of Correction (the "DOC").[1] Brown alleges that Defendants violated his constitutional rights while he was a pretrial detainee at Rikers Island. Brown also brings claims against Defendants under New York State law. Defendants move to partially dismiss the complaint[2] pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motion is granted in part and denied in part.

---

      [1] The court will refer to all defendants, collectively, as "Defendants," and the individuals, collectively, as the "Individual Defendants."

      [2] All references to the complaint refer to the amended complaint filed on November 17, 2015 (ECF No. 52).

# BACKGROUND

## I.     The Complaint[3]

Brown was arrested in April 2012 following a domestic dispute with his ex-wife. Compl. ¶ 22. After his arraignment, Brown was held as a pretrial detainee at the Otis Bantum Correctional Center, a DOC facility on Rikers Island. *Id.* ¶ 23–24. On July 7, 2012, the DOC moved Brown to a different facility on Rikers Island: the George Motchan Detention Center ("GMDC"). *Id.* ¶ 24.

### A.     Attack on Brown in GMDC's Dayroom

At approximately 4:30 PM on July 15, 2012, Brown entered a dayroom at GMDC and sat down in a chair. *Id.* ¶¶ 46–47. After Brown sat down, four inmates who were members of the Bloods gang approached him and told him to get up because "the chair belonged to Bloods." *Id.* ¶ 48. Brown did not get up and instead asked why he could not sit in the chair. *Id.* ¶ 49. The four inmates then attacked him. *Id.* The attack lasted for about twenty minutes and rendered Brown unconscious. *Id.* ¶¶ 50–51.

Correction Officer ("CO") Regina James and CO Kenyonda Grinkley witnessed the attack but did not intervene. *Id.* ¶¶ 52, 54. They "merely stood idly by and watched." *Id.* ¶ 54. After Brown had been severely wounded, CO James and CO Grinkley called for aid. *Id.* Brown's attackers then left the

---

[3] For purposes of this motion to dismiss, the court accepts Brown's factual allegations as true and draws all reasonable inferences in his favor. *See Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011).

area. *Id.* ¶ 57. Before assistance arrived, Brown regained consciousness and asked CO James why she did not protect him. *Id.* ¶ 55.

A group of additional DOC personnel, known as a "probe team," responded to the dayroom. *Id.* ¶ 56. The probe team was led by Captain Ronald Rudolph. *Id.* ¶ 16. Brown told Captain Rudolph that he had been attacked by four members of the Bloods. *Id.* ¶ 58. Brown also told Captain Rudolph that he wanted to press charges against the four Bloods members, but Brown did not know their names because he had just been transferred to GMDC. *Id.* ¶ 60–61. Brown asked Captain Rudolph and CO James to help him identify the four inmates who attacked him. *Id.* ¶ 61. Brown also complained to Captain Rudolph that CO James saw the attack but did not intervene.[4] *Id.* ¶ 59.

DOC personnel took Brown to GMDC's medical clinic. The doctor who saw Brown at the clinic noted that Brown had visible injuries to his back, lips, jaw, and ankle. *Id.* ¶ 72. At approximately 6:15 PM, Brown was transported from GMDC to Elmhurst Hospital Center, and later to Bellevue Hospital, for additional treatment. *Id.* ¶¶ 73, 132–33. Brown was diagnosed with a broken jaw and a fractured ankle. *Id.* ¶¶ 50, 134. Doctors performed surgery on Brown and implanted a plate, wires, and screws into his ankle. *Id.* ¶¶ 142–143. Brown was confined to a wheelchair for several months. *Id.* ¶ 144.

Captain Edwin Skepple was a supervisor on duty at the time of the incident. *Id.* ¶¶ 15, 105. Assistant Deputy Warden Raymond Beltz was the

---

[4] It is unclear why Brown did not also complain to Captain Rudolph that CO Grinkley saw the attack but did not intervene.

commanding officer on duty. *Id.* ¶¶ 14, 105. Assistant Deputy Warden Beltz tasked Captain Skepple with investigating the incident. *Id.* ¶ 105. Brown contends, however, that Captain Skepple did not conduct an investigation. *Id.* ¶ 106.

## B.    Post-Attack Events and Incident Reports

After the incident, CO James prepared and signed a handwritten report, dated July 15, 2012, detailing what she had observed. *Id.* ¶ 62. In the report, CO James wrote that she saw Brown and another inmate, "D.T.," engaged in a fist fight. *Id.* CO James said she ordered Brown and D.T. to stop fighting but they ignored her commands. *Id.* ¶ 63. According to the report, CO James then warned Brown and D.T. that she would use pepper spray if they continued fighting. *Id.* ¶ 64. CO James wrote that the fight then ended, and both inmates were escorted out of the area without further incident. *Id.* ¶¶ 64, 67. CO James also noted in her report that CO Grinkley witnessed the fight. *Id.* ¶ 65. Brown claims that CO James lied in this report to cover up the attack and to retaliate against him for his complaint about her to Captain Rudolph. *Id.* ¶ 62.

A similar report about the incident, also dated July 15, 2012, bears CO Grinkley's signature. *Id.* ¶ 69–70. Brown says this report, despite purporting to be authored by CO Grinkley, was really prepared by CO James as well. *Id.* ¶ 69.

On July 20, 2012, CO Jose Freire met with Brown to discuss the incident. *Id.* ¶ 166. At this meeting, Brown prepared a handwritten complaint stating that he was attacked by four members of the Bloods while CO James

4

stood by and watched. *Id.* ¶ 79. Brown also wrote that he wanted to press charges against CO James and the gang members. *Id.* CO Freire told Brown that he would show Brown a photo array of GMDC inmates to help Brown identify his attackers. *Id.* ¶ 166. CO Freire also said he would investigate Brown's complaint and assist Brown in pressing charges against CO James and the gang members. *Id.* ¶ 167.

Brown speculates that, after this exchange, CO Freire met with CO James, CO Grinkley, and Captain Skepple (the supervisor) to discuss the situation. *Id.* ¶ 168. Brown claims that, during this discussion, CO James, CO Grinkley, and Captain Skepple told CO Freire that they were working with other DOC personnel to cover up the truth about the incident. *Id.* ¶ 169. Specifically, Brown contends that CO James, CO Grinkley, and Captain Skepple informed CO Freire that Captain Rudolph (the probe team leader), Assistant Deputy Warden Beltz (the commanding officer), Deputy Warden Daniel O'Connell, and Deputy Warden Felipe Laboriel[5] were all part of the conspiracy to cover up the incident. *Id.* According to Brown, once CO Freire learned that these seven DOC personnel were working together to hide the truth, CO Freire agreed to join the effort to conceal the actual facts of the incident. *Id.* ¶ 170. Thus, after the discussion, CO Freire refused to meet with Brown again, did not provide Brown with the promised photo array, and did

---

[5] Brown lists Laboriel as "Acting Warden" in the case caption. Defendants, however, refer to Laboriel as a "Deputy Warden." The court assumes Defendants' description of Laboriel's DOC rank is correct, and thus the court will use "Deputy Warden" throughout this opinion.

not assist Brown in pressing charges against CO James and the four gang members. *Id.* ¶ 171.

On July 23, 2012, Captain Rudolph filed a report about the incident. *Id.* ¶ 77. Captain Rudolph wrote that he responded to the dayroom with the probe team on July 15, and Brown told him at the scene that he was involved in a fight with one other inmate. *Id.* ¶ 78. Brown contends that Captain Rudolph submitted this false report as part of his collusion with CO James, CO Grinkley, Captain Skepple, and other DOC personnel. *Id.* ¶¶ 77, 79.

On July 30, 2012, Captain Skepple submitted a report detailing the findings of his investigation.[6] *Id.* ¶ 107. In his report, Captain Skepple wrote that he attempted to question Brown on July 15 at GMDC's medical clinic but Brown refused to provide a statement or any information as to how he got hurt. *Id.* ¶ 108. Captain Skepple also noted that he told Brown that fighting was not tolerated in DOC facilities, and that Brown would be "infracted" for violating DOC rules. *Id.* ¶ 109. Captain Skepple wrote that he tried to give Brown a formal notice of the infraction during the morning of July 20, 2012—i.e., just before CO Freire went to meet with Brown—but Brown refused to sign and take a copy. *Id.* ¶¶ 110–11. Captain Skepple concluded in his report that no other inmates besides Brown and D.T. were involved in the altercation. *Id.* ¶¶ 113, 118. Captain Skepple speculated that Brown lied in his statement to CO Freire on July 20 because Brown had just been given notice of the infraction and

---

[6] As mentioned above, Brown alleges that Captain Skepple did not actually conduct an investigation.

wanted to make himself look like a victim to avoid discipline. *Id.* ¶¶ 115–17. Moreover, Captain Skepple praised CO James for her quick response to the situation. *Id.* ¶ 120. Brown claims that he never spoke to Captain Skepple and that this report, like the others, is inaccurate. *Id.* ¶¶ 107, 110.

Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz reviewed all of the reports, agreed with their findings, and "signed off" on them. *Id.* ¶ 150. Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz also praised their staff for responding quickly to the incident, exonerated CO James of any wrongdoing, and summarily dismissed Brown's complaint against CO James and the gang members. *Id.* ¶ 151. As the commanding officer, Assistant Deputy Warden Beltz submitted a final report about the incident. *Id.* ¶ 152. Beltz wrote that Brown and D.T. were "horse playing" when the situation escalated and turned into a fist fight. *Id.* ¶ 154. Brown contends that Beltz's report contains numerous lies and was fabricated to cover up the incident.

Brown supports his allegation that Defendants' fist-fight theory is implausible by highlighting D.T.'s physical traits and medical records. D.T. is 5 feet, 7 inches tall and weighs 140 pounds. *Id.* ¶ 140. Brown, on the other hand, is 5 feet, 9 inches tall and weighs 180 pounds. *Id.* ¶ 139. Like Brown, D.T. was seen by a doctor at GMDC's clinic after the incident. *Id.* ¶ 135. But unlike Brown, D.T. did not sustain any visible injuries and did not need treatment. *Id.* ¶¶ 135–36. Brown says it is impossible that D.T., who weighs

less than Brown, inflicted such severe injuries on Brown without sustaining any injuries of his own. *Id.* ¶ 146.

On September 18, 2012, Brown met with Captain Rudolph to complete an application for protective custody. *Id.* ¶ 81. Brown wrote that he was attacked by four members of the Bloods gang, and that he was worried the Bloods would target him again. *Id.* ¶ 84. Captain Rudolph signed Brown's application as a witness. *Id.* ¶ 85. Captain Rudolph wrote in his own separate form, though, that Brown was involved in an altercation with just one other inmate who is a known member of the Bloods. *Id.* ¶¶ 86–87.

The DOC did not hold a hearing to adjudicate the merits of the misbehavior report filed against Brown. *Id.* ¶¶ 157, 159, 163. The infraction remained in Brown's official inmate file. *Id.* ¶¶ 161–62. Defendants relied on the misbehavior report to maintain Brown's custody level at a classification that deprived him of several benefits available to inmates with a lower custody level classification. *Id.* ¶ 164.

## C. Screening for Gang Membership

Brown claims that D.T. did not belong in GMDC's general population. Brown says CO Tietjen,[7] who processed D.T.'s inmate classification, failed to screen D.T. for gang membership. *Id.* ¶ 187. Further, Brown alleges that Warden Brian Suprenant, the individual responsible for approving D.T.'s initial

---

[7] Brown refers to this defendant as "Tretjen," and the case caption includes that spelling. Defendants, however, refer to this individual as "Tietjen." The court assumes Defendants' spelling is correct, and will thus use "Tietjen" throughout this opinion.

placement, also improperly reviewed D.T.'s criminal history and missed D.T.'s gang membership. *Id.* ¶¶ 188–89. According to Brown, had CO Tietjen and Warden Suprenant properly evaluated D.T., then D.T. would have been placed in a special housing area away from the general population. *Id.* ¶¶ 190–92.

### D. Allegations of Violence and Corruption at GMDC

Brown further alleges that GMDC is known for inmate assaults. Brown says that DOC Commissioner Joseph Ponte and other DOC officials are aware of gang-related violence at GMDC but do not take corrective action. *Id.* ¶¶ 35–44, 197–98. Moreover, Brown claims that correction officers regularly recruit inmates who are gang members to help control the general prison population. *Id.* ¶¶ 27–28, 45. Brown contends that correction officers give these gang members exclusive use of common areas, including dayrooms and chairs, and allow gang members to attack other inmates who attempt to use these areas. *Id.* ¶ 32–34. According to Brown, a few days before he was attacked, another inmate at GMDC was attacked by the Bloods in a similar manner. *Id.* ¶ 193.

### II. Procedural History

Brown brought this lawsuit on September 30, 2013. Defendants answered the original complaint and, on April 16, 2015, moved for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Brown responded on June 2, 2015 by moving for leave to amend his complaint. The court granted Brown's motion for leave to file an amended complaint on November 13, 2015. ECF No. 49. In light of that decision, the court denied Defendants' motion for partial judgment on the pleadings.

Brown filed his amended complaint on November 17, 2015 and listed the following parties as defendants: the City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO James, CO Grinkley, CO Tietjen, and CO Freire. Each of the Individual Defendants is named in his or her official capacity and individual capacity. Six of these defendants—Ponte, Suprenant, Laboriel, O'Connell, Rudolph, and Tietjen— were not listed in the original complaint. On the other hand, some defendants listed in the original complaint were not named in the amended complaint, including former DOC Commissioner Dora Schriro and numerous "John Doe" and "Jane Doe" defendants.

In his amended complaint, Brown brings various claims against Defendants through eight causes of action. The first four causes of action arise under 42 U.S.C. § 1983 and allege as follows:

(1)    Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and CO Tietjen engaged in conduct that "amounted to deliberate indifference to a serious threat to the health or safety, cruel and inhuman treatment, cruel and unusual punishment and denial of due process rights." *Id.* ¶¶ 204–07.

(2)    Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and Captain Rudolph engaged in conduct that "amounted to first amendment retaliation and denial of due process rights." *Id.* ¶¶ 208–11.

(3)    Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, Captain Rudolph, and CO Freire engaged in conduct that "amounted to conspiracy, denial of equal

protection of the laws and denial of due process rights." *Id.*
¶¶ 212–15.

(4) The City is liable for having an unconstitutional municipal policy or custom, and for failing to properly train, supervise, or discipline its correction officers. *Id.* ¶¶ 216–45.

The remaining four causes of action arise under state law and make the following allegations:

(5) All defendants violated Brown's rights under various provisions of the New York State Constitution. *Id.* ¶¶ 246–50.

(6) All defendants are liable for "other New York torts," including "negligence, assault and battery, and breach of special duty or relationship." *Id.* ¶¶ 251–53.

(7) Unspecified defendants are liable for intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* ¶¶ 254–57.

(8) The City negligently hired and retained DOC employees. *Id.* ¶¶ 258–62.

On March 16, 2016, all defendants except for CO James and CO Grinkley moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, the City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire seek dismissal of all Brown's claims against them.

## **DISCUSSION**

### I. **Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## II.  Claims Against the Individual Defendants in their Official Capacities

The court notes that Brown has sued the Individual Defendants in both their official and individual capacities. Compl. ¶¶ 10–20. Brown's claims against the Individual Defendants in their official capacities are duplicative of his claims against the City because "a suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 n.2 (1997) (internal quotation marks and citations omitted). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010) ("[I]n a suit against a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." (internal quotation marks and citation omitted)). "Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims

as redundant." *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012). Thus, Brown's claims against the Individual Defendants in their official capacities are dismissed.

### III.  Section 1983 Claims

As outlined above, Brown asserts four causes of action against Defendants pursuant to 42 U.S.C. § 1983. "Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). The City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire (i.e., all defendants except for CO James and CO Grinkley) move to dismiss Brown's § 1983 claims.

### A.  Timeliness

As a preliminary matter, the six individuals added as defendants in the amended complaint—Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen— contend that all of Brown's claims against them are time-barred. The statute of limitations for claims brought pursuant to § 1983 is determined by state law. *Owens v. Okure*, 488 U.S. 235, 249–51 (1989). In New York State, the statute of

limitations for personal injury actions under § 1983 is three years. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). The incident that is the subject of this lawsuit occurred on July 15, 2012. Brown filed his original complaint on September 30, 2013—well within the limitations period. But the original complaint did not name Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen as defendants. On June 2, 2015, Brown moved to amend his complaint to add these six individuals. The court granted Brown's motion to amend on November 13, 2015, and Brown promptly filed his amended complaint on November 17, 2015.[8] Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen argue that Brown's § 1983 claims against them are time-barred because the amended complaint was filed more than three years after the date of the incident.

"When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Nw. Nat'l Ins. Co. v. Alberts*, 769 F. Supp. 498, 510 (S.D.N.Y. 1991). Here, Brown filed his motion to amend on June 2, 2015, which was within the three-year limitations period that began to run on July 15, 2012. The fact that the amended complaint was not actually

---

[8] Brown attempted to file his amended complaint on November 16, 2015, but due to a filing error, it was not properly docketed until November 17, 2015.

filed until November 17, 2015 is irrelevant. Brown's § 1983 claims against the six new defendants in the amended complaint are, therefore, timely.

Having determined that all of the § 1983 claims in Brown's amended complaint are timely, the court turns to their merits. The court first considers Brown's claims against the Individual Defendants, followed by his claims against the City.

### B. Claims Against the Individual Defendants

#### 1. Personal Involvement

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citation omitted). Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire argue that Brown cannot state claims against them under § 1983 because they were not personally involved in any violation of his constitutional rights. The court will address the personal involvement of each of these defendants in turn. Before examining the specific allegations about each defendant, though, the court notes that Brown alleges generally that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Freire were "were working in cahoots . . . to cover up the actual facts of the incident." Compl. ¶ 169. This broad assertion does not establish their personal involvement.

15

"To state a legal truism, just because a litigant posits the existence of a conspiracy does not make it plausible." *McIntosh v. United States*, No. 14-cv-7889, 2016 WL 1274585, at *15 (S.D.N.Y. Mar. 31, 2016). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983). Thus, Brown's assertion that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Freire were part of a conspiracy is insufficient to state a claim under § 1983 because it is conclusory, vague, and unsupported by specific factual allegations.

Having disposed of Brown's vague allegations about a conspiracy, the court turns to his specific allegations about each of the Individual Defendants seeking dismissal.

### a.    Commissioner Ponte

Ponte became DOC Commissioner in April 2014—i.e., nearly two years after the incident. Accordingly, Commissioner Ponte could not conceivably have had any personal involvement in the constitutional violations Brown claims to have suffered in July 2012. Brown's § 1983 claims against Commissioner Ponte are therefore dismissed.

### b.    Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple

Brown contends that he has "adequately pleaded supervisory liability" against Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy

16

Warden Beltz, and Captain Skepple. Pl.'s Br. 23. Brown cannot, however, state

§ 1983 claims against these defendants merely because they were supervisors

at GMDC. *See Hernandez v. Keane*, 341 F.3d 137, 144–45 (2d Cir. 2003)

(noting that a supervisory official cannot be held liable under § 1983 simply

because he had a position of authority). Instead, to establish their liability,

Brown must show that they were personally involved in the allegedly unlawful

conduct. *See id.* Proof of "linkage in the prison chain of command" is

insufficient. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).[9]

---

[9] The Second Circuit has previously held that the personal involvement of a supervisory defendant can be shown in five ways: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

The Supreme Court's 2009 decision in *Iqbal*, though, may have nullified all or part of *Colon*'s holding. *See Hollins v. City of New York*, No. 10-cv-1650, 2014 WL 836950, at *13 (S.D.N.Y. Mar. 3, 2014) ("The district courts of the Second Circuit disagree about what remains of *Colon* after *Iqbal*."). *Iqbal* addressed supervisory liability claims, and held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. "Accordingly, some courts in this Circuit have found that *Iqbal* abrogated all of the *Colon* categories except for the first and either all or part of the third." *Doe v. New York*, 97 F. Supp. 3d 5, 11 (E.D.N.Y. 2015).

This court need not make a ruling on whether all of the *Colon* categories remain after *Iqbal* because, as will be discussed below, Brown has pled facts sufficient to establish that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple directly participated in an alleged constitutional violation.

Brown alleges that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple (1) allowed the Bloods to control aspects of GMDC, (2) authored or "signed off" on false reports, and (3) failed to hold a hearing to adjudicate the misbehavior reports. Compl. ¶¶ 32, 75, 150, 157. Brown's first allegation about these defendants—that they created or acquiesced in an unconstitutional policy by allowing the Bloods to control GMDC's common areas—is insufficient to establish personal involvement. "[T]o hold supervisors liable for creating a custom or policy fostering a constitutional violation, courts in this Circuit have required that plaintiffs plead more than conclusory allegations of the existence of the custom or policy." *Lindsey v. Butler*, 43 F. Supp. 3d 317, 330 (S.D.N.Y. 2014); *see also Burgis v. Dep't of Sanitation City of New York*, No. 13-cv-1011, 2014 WL 1303447, at *6 (S.D.N.Y. Mar. 31, 2014) ("[I]ncluding boilerplate language alleging the existence of a policy, without factual allegations to support it, is not enough at the pleading stage."). "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

Brown contends that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple gave gang members special privileges and responsibilities at GMDC. But Brown has not pled any specific facts that, if accepted as true, would establish that these defendants created this policy or allowed it to continue under their watch. For

example, Brown does not allege that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple instructed specific correction officers to behave this way, nor does Brown claim that Laboriel, O'Connell, Beltz, and Skepple learned of and ignored specific instances of correction officers condoning attacks by the Bloods. The complaint's conclusory statements that these defendants' created an unconstitutional policy are thus insufficient to demonstrate their personal involvement in this case.

Brown's allegation that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple failed to arrange a disciplinary hearing is also insufficient to establish their personal involvement. Although a prisoner has "a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report," *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997), the complaint here does not contain any specific description of the liberty interest that Brown allegedly lost. In fact, all Brown says is that he was deprived of "several benefits available to an inmate with lower custody level classification." *See* Compl. ¶ 164. This vague assertion does not establish a constitutional violation. Moreover, there is no indication that these defendants were even responsible for scheduling disciplinary hearings at GMDC. Thus, Brown's claim that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple failed to arrange a disciplinary hearing is insufficient to establish their personal involvement in a constitutional violation.

Brown's allegations about the false reports, though, are sufficient to establish the personal involvement of Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple. Brown contends that Assistant Deputy Warden Beltz and Captain Skepple authored false reports, and that Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz "signed off" on false reports prepared by others. Compl. ¶¶ 75, 150. Defendants cite the Second Circuit's decision in *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) for the proposition that "the creation of an inaccurate report alone" does not constitute a constitutional violation. Defs.' Br. 15. Here, however, Brown alleges not only that the incident reports were inaccurate, but also that the Individual Defendants who authored and reviewed them did so to retaliate against him for his complaint about CO James. Although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," the creation of a false report can infringe on an inmate's constitutional rights when it is used to retaliate against him for exercising a constitutional right. *Boddie*, 105 F.3d at 862. Since the complaint here plausibly suggests that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple had a retaliatory motive, the court cannot dismiss Brown's § 1983 claims against them for lack of personal involvement. *Cf. Heyliger v. Gebler*, No. 06-cv-6220L, 2010 WL 7746201, at *2 (W.D.N.Y. July 30, 2010) (dismissing a § 1983 claim against a correction officer that was premised on the officer filing a false report

because there was "no suggestion in the complaint that [the defendant] acted out of any retaliatory motive").

To summarize, at this stage in the litigation, Brown's allegation that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple had a retaliatory motive in drafting and approving false reports is sufficient to establish their personal involvement in a constitutional violation. Brown's other allegations about these defendants, though, are insufficient to show personal involvement.

### c. Captain Rudolph

Brown alleges that Captain Rudolph was personally involved in violating his constitutional rights in two ways. First, Brown contends that Captain Rudolph filed a false report to cover up the attack and to retaliate against him. Compl. ¶¶ 75, 95. Second, Brown alleges that Captain Rudolph lied on the protective custody application. *Id.* ¶¶ 86–87.

As discussed above, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie*, 105 F.3d at 862. "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Id.* Here, Brown claims that Rudolph lied in the incident report and on the protective custody application to retaliate against him for complaining about CO James. At this point in the litigation, these allegations are sufficient to establish Captain Rudolph's personal involvement in a violation of Brown's constitutional rights.

### d.    CO Freire

Brown contends that CO Freire violated his constitutional rights by failing to investigate the incident. Brown alleges that CO Freire originally promised to provide him with a photo array to help identify the attackers and press charges against them, but decided not to after speaking with other DOC personnel and agreeing "to work in cahoots" with them. There is, however, no constitutional right to an investigation by government officials. *See Hayes v. Cty. of Sullivan*, 853 F. Supp. 2d 400, 433 (S.D.N.Y. 2012); *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 438 (S.D.N.Y. 2004). "Furthermore, a victim of allegedly criminal conduct is not entitled to a criminal investigation or the prosecution of the alleged perpetrator of the crime." *Johnson v. Ruiz*, No. 3:11-cv-542, 2012 WL 90159, at *4 (D. Conn. Jan. 10, 2012). Accordingly, Brown cannot establish CO Freire's personal involvement in any violation of his constitutional rights by alleging that CO Freire failed to properly investigate Brown's complaint.

Brown makes a related argument that, because CO Freire did not uncover the identities of the Bloods members, Brown has been deprived of his opportunity to sue them, which he says is a violation of his constitutional rights. To support his claim, Brown cites the Supreme Court's decision in *Bounds v. Smith*, 430 U.S. 817 (1977), and the Second Circuit's decision in *Ayers v. Ryan*, 152 F.3d 77 (2d Cir. 1998). These cases, though, do not support Brown's claims.

In *Bounds*, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828. Brown does not allege that he was hindered from accessing legal materials or lawyers, so *Bounds* is irrelevant.

In *Ayers*, the Second Circuit held that a prison official violated an inmate's due process rights by not following through on a promise to assist the inmate in preparing his defense for a disciplinary hearing. 152 F.3d at 80–81. *Ayers* is distinguishable because Brown does not allege that CO Freire promised to help with a disciplinary hearing, but rather that CO Freire promised to act as Brown's personal investigator for a potential civil lawsuit or criminal action. Even assuming CO Freire made this promise, it would be insufficient to make him personally involved in any violation of Brown's constitutional rights.

Brown, therefore, has not pled facts sufficient to establish CO Freire's personal involvement in any violation of his constitutional rights. The § 1983 claims against CO Freire are dismissed.

### e. Warden Suprenant and CO Tietjen

Brown says that Warden Suprenant and CO Tietjen caused D.T. to be improperly placed in the general prison population, which jeopardized Brown's health and safety. This allegation plausibly suggests that Warden Suprenant and CO Tietjen were personally involved in a violation of Brown's rights under

the Fourteenth Amendment. Whether their conduct actually amounted to a constitutional violation is discussed below. The court cannot, however, dismiss the complaint against them for lack of personal involvement.

### f.    Summary

Having determined that Brown has alleged facts sufficient to support the personal involvement of Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Tietjen, the court will now address the substance of Brown's § 1983 claims against them.

### 2.    Deliberate Indifference

In his first cause of action pursuant to § 1983, Brown alleges, among other things, that Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen engaged in conduct that amounted to deliberate indifference to his health or safety. Brown's deliberate indifference claims arise under the Due Process Clause of the Fourteenth Amendment because he was a pretrial detainee at the time of the incident. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). While a convicted prisoner's claim of deliberate indifference arises under the Eighth Amendment's prohibition on cruel and unusual punishment, this proscription does not apply to a pretrial detainee because a pretrial detainee is not being punished. *Id.* A pretrial detainee's rights under the Fourteenth Amendment, though, "are 'at least as great as the Eighth Amendment

protections available to a convicted prisoner.'" *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. The claim consists of two prongs. The first is the "objective prong," which requires the pretrial detainee to show "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." *Id.* The second is the "subjective prong," under which the pretrial detainee must prove "that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* The Second Circuit has suggested that the subjective prong is "perhaps better classified as a '*mens rea* prong' or 'mental element prong.'" *Id.*

To establish an objective deprivation under the first prong, a plaintiff must show that he was detained under conditions posing an unreasonable risk of serious damage to his health, including his "physical and mental soundness." *Id.* at 30 (citations omitted). The parties here dispute whether Brown was subject to an unreasonable risk of serious harm. Defendants argue that such a risk can only be demonstrated where there is evidence of a previous altercation between an inmate and his attacker, coupled with a request by the inmate to be separated from the attacker. Brown counters that evidence of a specific risk is not required. The court need not decide this issue because, as explained below, Brown has not sufficiently alleged that Warden

Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant

Deputy Warden Beltz, Captain Skepple, and CO Tietjen acted with deliberate

indifference as contemplated by the subjective prong.

To show deliberate indifference under the subjective prong, "the pretrial

detainee must prove that the defendant-official acted intentionally to impose

the alleged condition, or recklessly failed to act with reasonable care to mitigate

the risk that the condition posed to the pretrial detainee even though the

defendant-official knew, or should have known, that the condition posed an

excessive risk to health or safety."[10] *Id.* at 35. Therefore, the pretrial detainee

must prove that the prison official acted with "a *mens rea* greater than mere

negligence," *id.* at 36, because "liability for *negligently* inflicted harm is

categorically beneath the threshold of constitutional due process," *Kingsley v.

Hendrickson*, 135 S. Ct. 2466, 2472 (2015). "Absent clear notice of a risk of

harm to the prisoner, [c]ourts routinely deny deliberate indifference claims

based upon surprise attacks." *Fernandez v. New York City Dep't of Corr.*,

No. 08-cv-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) (internal

quotation marks and citation omitted).

Here, Brown has not pled facts to establish that Warden Suprenant,

Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden

Beltz, Captain Skepple, and CO Tietjen acted with the state of mind necessary

to establish deliberate indifference. None of these individuals was present at

_____

[10] "In other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." *Darnell*, 849 F.3d at 35.

26

the time of the attack, and thus none of them could have actually intervened to stop it. Further, none of these defendants was on notice that an attack was imminent because there had been no prior altercations involving Brown, and Brown had not complained to any prison officials that he was in danger.

At worst, Warden Suprenant and CO Tietjen improperly placed Brown and D.T. together in the general prison population. Brown himself describes this conduct as mere negligence. *See* Compl. ¶ 194 ("The defendants *negligently* placed the plaintiff in GMDC . . . .") (emphasis added); *id.* ¶ 199 ("The defendants *negligently* placed the plaintiff in GMDC . . . .") (emphasis added). Because "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence," *Darnell*, 849 F.3d at 36, Brown's deliberate indifference claims against Warden Suprenant and CO Tietjen are dismissed.

Brown's allegations regarding Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple primarily relate to post-attack investigations and reports. Brown says that Assistant Deputy Warden Beltz and Captain Skepple prepared false reports, and that Deputy Warden Laboriel, Deputy Warden O'Connell, and Assistant Deputy Warden Beltz "signed off" on false reports. Brown also claims that Assistant Deputy Warden Skepple failed to conduct a proper investigation. Even if these allegations are true, they do not support a claim for deliberate indifference because they occurred *after* the attack, and thus in no way imply that these defendants knew of and disregarded an excessive risk to Brown's safety leading

up to the incident. Finally, Brown's allegations that Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple acted with deliberate indifference to his safety by allowing the Bloods to control common areas at GMDC is insufficient to state a claim under § 1983 because, as discussed above, Brown has pled no specific facts to support the theory. *See Iqbal*, 556 U.S. at 678 (holding that a complaint fails if it "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citation omitted). Accordingly, Brown's deliberate indifference claims against Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, and Captain Skepple are dismissed.

To summarize, Brown brought a deliberate indifference claim against Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, CO James, CO Grinkley, and CO Tietjen. *See* Compl. ¶¶ 204–07. The claim is dismissed as to Commissioner Ponte for lack of personal involvement. For the reasons described above, the claim is also dismissed as to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, and CO Tietjen. Brown's deliberate indifference claim, then, only remains as to CO James and CO Grinkley.

### 3.    Other Claims Under § 1983 Against the Individual Defendants

As described in the procedural history, Brown asserts a variety of other claims against the Individual Defendants pursuant to § 1983. Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell,

Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire (i.e., all defendants except for CO James and CO Grinkley) move to dismiss these claims. Their only argument, though, is lack of personal involvement. Because the court has found that neither Commissioner Ponte nor CO Freire was personally involved in any violation of Brown's constitutional rights, all of Brown's § 1983 claims against Commissioner Ponte and CO Freire are dismissed. But to the extent the complaint asserts other claims under § 1983—i.e., claims not for deliberate indifference—against Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, and CO Tietjen, those claims remain.

### E. *Monell* Claim Against the City

Brown alleges that the City has failed to properly train, supervise, or discipline its correction officers. Brown also contends that the City has a policy or custom of encouraging false reports and allowing the Bloods and other gangs to operate DOC facilities. According to Brown, the City's policy/custom and inadequate training program resulted in a deprivation of his constitutional rights, and he seeks to hold the City liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City moves to dismiss the claim.

In *Monell*, the Supreme Court held that a municipality may not be held liable under § 1983 for its employees' conduct solely on the basis of *respondeat superior. Id.* at 694. Instead, to state a claim for relief against a local government under § 1983, a plaintiff must show that the violation of his

constitutional rights resulted from a municipal policy or custom. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Additionally, in limited circumstances, a municipality's failure to train its employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *Id.*

"Ultimately, the burden is on the plaintiff to 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury.'" *Whitfield v. City of Newburgh*, No. 08-cv-8516, 2015 WL 9275695, at *28 (S.D.N.Y. Dec. 17, 2015) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)). The plaintiff must also establish a causal connection, or an "affirmative link," between the municipal policy and the deprivation of his constitutional rights. *Tuttle*, 471 U.S. at 823.

Brown offers two avenues for relief under *Monell*. First, Brown says that the City has failed to properly train and supervise its correction officers. Second, Brown contends that the City has an unofficial custom of engaging gangs to operate DOC jails and using false reports to cover up incidents involving inmates. The City counters that Brown has failed to state a plausible *Monell* claim under either of these theories. Alternatively, the City argues that even if Brown has sufficiently alleged the existence of a municipal policy, he

has not plausibly alleged that a particular violation of his constitutional rights was directly caused by such a policy.

### 1. Failure to Properly Train, Supervise, or Discipline

To state a claim against a municipality for its failure to properly train, supervise, or discipline its employees, a plaintiff must show that the local government acted with "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The "deliberate indifference" test "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "The operative inquiry is whether the municipality was on *notice* that 'a particular omission in their training program causes city employees to violate citizens' constitutional rights.'" *Williams v. City of New York*, 121 F. Supp. 3d 354, 373–74 (S.D.N.Y. 2015) (quoting *Connick*, 563 U.S. at 61).

Here, Brown has not offered any specific factual allegations regarding the City's training, supervision, or discipline programs for DOC personnel. In fact, there is only one reference to the City's training program in the complaint, and it simply alleges in conclusory terms that the City's training is inadequate. *See* Compl. ¶ 217. Since a plaintiff cannot "unlock the doors of discovery" with "nothing more than [his] unsupported supposition," *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 299 (S.D.N.Y. 2009), the court

dismisses Brown's *Monell* claim to the extent it is based on the City's alleged failure to properly train its employees.

## 2.   Unconstitutional Policy or Custom

Brown also alleges that the City, acting through the DOC, unofficially delegates duties to gangs at Rikers, fails to protect inmates from attacks by other inmates, and encourages false reports to cover up incidents. A municipal "policy" is generally defined as a regulation that has been officially promulgated through a formal act by the municipality's governing body. *Monell*, 436 U.S. at 690. A municipal "custom," on the other hand, is not formally approved but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404. "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

Here, Brown concedes that he "does not have any evidence at this time" to suggest that the DOC had an official or formal policy of turning over control of DOC facilities to the Bloods. Pl.'s Br. 11. Brown argues, however, that the City's "tolerance" of the Bloods and their activities at DOC jails is so well settled that City policymaking officials can be said to have either actual or constructive knowledge of it. In essence, Brown contends that the City has a custom of allowing gangs to control certain aspects of DOC facilities.

To sustain a claim for municipal liability under § 1983 based on the existence of a custom, a plaintiff must do more than simply state that a municipal custom exists. *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). "Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Id.* A single instance of unconstitutional conduct is generally insufficient to infer that a municipality has an unlawful policy or custom. *Tuttle*, 471 U.S. at 823–24. However, courts in this Circuit have held that a plaintiff may state a plausible *Monell* claim by citing cases or newspapers articles containing allegations of similar repeated misconduct. *See, e.g.*, *Gonzalez v. New York City*, No. 16-cv-00254, 2016 WL 7188147, at *8 (S.D.N.Y. Dec. 2, 2016) (collecting cases).

Brown alleges numerous times that the DOC allows—even invites—the Bloods to control DOC facilities such as GMDC. *See, e.g.*, Compl. ¶¶ 27–28, 32–38, 44–45. Standing alone, these allegations are conclusory and are insufficient to support a plausible *Monell* claim based on Brown's single incident. But Brown also claims that the Bloods perpetrated a similar attack on another inmate a few days before he was attacked, Compl. ¶ 193, and he cites an assortment of cases and articles reporting on corruption and gang-related violence at Rikers. Granted, many of these reports offer no support for Brown's allegation that the City has an unofficial custom of allowing gang activity to occur at GMDC. Certain ones, however, bear enough factual similarity to the

incident that is the subject of this lawsuit to allow Brown's *Monell* claim to survive the City's motion to dismiss.

For example, Brown cites a *New York Times* article about the killing of a teenage inmate at Rikers by other inmates in 2008. Compl. ¶¶ 229–33. In that case, the teen's attackers had allegedly been enlisted by correction officers to act as enforcers to help maintain control over the jail. The scheme, nicknamed "the Program," also gave certain inmates special privileges such as deciding who was allowed to use chairs in common rooms.

Brown also cites a 2007 *Village Voice* article reporting on violence at Rikers. *Id.* ¶¶ 240–41. That article, which quotes deposition testimony by a former correction officer, describes how certain inmates were deputized as enforcers by correction officers to control other inmates. The article also discussed an alleged practice known as "write with us," in which DOC personnel conspired to make false reports on incidents involving inmates.

These articles, which contain allegations that are strikingly similar to the factual allegations here, plausibly support Brown's contention that the DOC has not adequately responded to a pattern of misconduct. At this stage in the litigation, the court finds that Brown has adequately alleged the existence of a municipal policy or custom.

### 3. Causal Connection

To state a claim for municipal liability under § 1983, a plaintiff must not only establish the existence of a municipal policy or custom, but also show a causal connection, or "affirmative link," between the policy and the deprivation

of his constitutional rights. *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). The City argues that, even if Brown has sufficiently alleged the existence of a municipal policy, he has not plausibly alleged that his constitutional rights were violated as a result of that policy.

If the City has a custom of enlisting gang members to help control other inmates, it is plausible that the attack on Brown—and the correction officers' lack of response—was directly connected to this policy. Accordingly, the City's motion to dismiss Brown's claim for municipal liability based on an unofficial custom or practice is denied.

## III.   State Law Claims

In addition to his federal claims, Brown brings various state law claims against Defendants. The court addresses these claims below.

### A.    Claims Under the New York State Constitution

Brown asserts that Defendants violated his rights under the New York State Constitution. There is, however, no private right of action under the New York State Constitution for claims that can be brought under § 1983. *Davis v. City of New York*, No. 15-cv-08575, 2016 WL 4532203, at *10 (S.D.N.Y. Aug. 29, 2016). Here, § 1983 provides a remedy for all of the claims Brown brings under the New York State Constitution against the Individual Defendants. Brown's state constitutional claims against the Individual Defendants are therefore dismissed. *See Allen v. Antal*, 665 F. App'x 9, 13–14 (2d Cir. 2016) (affirming a district court's dismissal of claims brought under the New York State Constitution where alternative remedies were available).

But § 1983 does not provide an alternative remedy for Brown's state constitutional claims against the City because § 1983 does not recognize *respondeat superior* liability. *See Campbell v. City of New York*, No. 09-cv-3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011). Thus, to the extent Brown asserts claims under the New York State Constitution against the City, those claims survive.

### B.  Claim Against the City for Negligent Hiring and Retention

Brown also brings a claim against the City for negligent hiring and retention. The City seeks dismissal of this claim, and Brown voluntarily withdraws it with prejudice. This claim is therefore dismissed with prejudice.

### C.  Remaining State Law Claims

Brown further alleges that Defendants are liable for various torts under New York State law. The City, Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant Deputy Warden Beltz, Captain Skepple, Captain Rudolph, CO Tietjen, and CO Freire move to dismiss these claims.

The City, Assistant Deputy Warden Beltz, Captain Skepple, and CO Freire offer no argument in support of their motion to dismiss these state law claims. Their motion is thus denied.

Commissioner Ponte, Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen (i.e., the six individuals added in the amended complaint) argue that Brown's state law claims against them are time barred. Brown's state law tort claims against the

City and its employees are subject to a one-year and ninety-day statute of limitations. *See* N.Y. Gen. Mun. § 50-i(1)(c); *Jones v. City of New York*, No. 13-cv-929, 2016 WL 1322443, at *5 (S.D.N.Y. Mar. 31, 2016). Brown does not dispute the length of the limitations period or its application to these claims but he contends that, despite the limitations period, his state law claims are nonetheless timely.

In support of his argument that the state law claims against Commissioner Ponte are timely, Brown points to Federal Rule of Civil Procedure 25(d), which provides that when a public officer who is a party in an official capacity ceases to hold office while a lawsuit against him is pending, the officer's successor is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d); *Gusler v. City of Long Beach*, No. 10-cv-2077, 2015 WL 3796328, at *1 (E.D.N.Y. June 18, 2015). Brown's original complaint listed Commissioner Schriro as a defendant. Ponte replaced Schriro as DOC Commissioner in April 2014. Under Rule 25(d), Ponte was automatically substituted—in his official capacity—as a party in this litigation at that time. But as discussed above, Brown's claims against the Individual Defendants in their official capacities are duplicative of his claims against the City. To the extent Brown asserts claims against Commissioner Ponte in his individual capacity, Rule 25(d) is irrelevant. Thus, Brown's state law claims against Commissioner Ponte in his individual capacity are untimely.

With respect to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen, Brown argues that his

state law claims against them are timely due to the "relation back" doctrine. Both the Federal Rules of Civil Procedure and New York State law allow, in certain circumstances, an amended pleading to relate back to the date of the original pleading for purposes of the statute of limitations. "Federal courts choosing between federal and state relation back doctrines should pick the more forgiving principle of relating back." *Fisher v. Cty. of Nassau*, No. 10-cv-0677, 2011 WL 4899920, at *4 (E.D.N.Y. Oct. 13, 2011) (internal quotation marks and citations omitted). Here, the federal relation back doctrine allows Brown to proceed with his state law claims against Deputy Warden Laboriel. However, neither the federal relation back doctrine nor the New York relation back doctrine saves Brown's untimely state law claims against Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen.

The federal relation back doctrine is governed by Rule 15(c)(1) of the Federal Rules of Civil Procedure. An amended complaint that adds a party to the litigation after the statute of limitations has run relates back to the original complaint if (1) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set forth in the original complaint, and (2) within the time for serving the original complaint, the new party both (i) received such notice of the action that it will not be prejudiced in defending on the merits, and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity. Fed. R. Civ. P. 15(c)(1)(C); *Fisher*, 2011 WL 4899920, at *4; *Abdell v. City of New York*, 759 F. Supp. 2d 450, 454 (S.D.N.Y. 2010).

It is clear that the new claims against Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen arise out of the same occurrence set forth in the original complaint, namely the attack on Brown at GMDC. Only Deputy Warden Laboriel, though, received timely notice of the action.

Rule 15 requires that the party to be added receive notice of the action within the time period provided by Rule 4(m), which—at the time this lawsuit began in 2013—was 120 days after the filing of the complaint.[11] *See* Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 15(c)(1)(C). Notice for purposes of Rule 15 can be either actual or constructive. *Girau v. Eurpower, Inc.*, 317 F.R.D. 414, 421 (S.D.N.Y. 2016). "Under the constructive notice doctrine, the court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the officials originally sued, so long as there is some showing that the attorney[s] knew that the additional defendants would be added to the existing suit." *Muhammad v. Pico*, No. 02-cv-1052, 2003 WL 21792158, at *20 (S.D.N.Y. Aug. 5, 2003) (internal quotation marks and citations omitted). "The relevant inquiry for determining whether such constructive notice should be based on 'sharing of counsel' is whether counsel 'knew or should have known' within the limitations period that the additional defendants would be added." *Samuels v. Dalsheim*, No. 81-cv-7050,

---

[11] Rule 4(m) has since been amended to reduce the presumptive time for serving a defendant from 120 days to 90 days. *See* Fed. R. Civ. P. 4(m) advisory committee's note to 2015 amendment. The court will apply the 120-day period here since that rule was in effect at the time service was originally made.

1995 WL 1081308, at *14 (S.D.N.Y. Aug. 22, 1995) (quoting *Gleason v. McBride*, 869 F.2d 688, 693 (2d Cir. 1989)).

In the caption of his original complaint, Brown listed "Deputy Warden John Doe [Shield# 561]" as a defendant. *See* ECF No. 1. In his amended complaint, Brown replaced this John Doe defendant with "Acting Warden Felipe Laboriel [Shield # 561]."[12] *See* ECF No. 52. Because Brown specifically identified Laboriel by his shield number in the original complaint, counsel knew or should have known within the limitations period that Laboriel would be added as a defendant. Further, this knowledge can be imputed to Laboriel within 120 days of when the original complaint was filed on September 20, 2013 because defense counsel appeared in this matter on January 7, 2014. *See* ECF Nos. 1, 3. Accordingly, Brown's state law claims against Deputy Warden Laboriel relate back under Rule 15.

Rule 15, however, is of no help to Brown with respect to Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. These defendants were not identified in any manner in the original complaint's caption. Moreover, the original complaint contained no factual allegations regarding these defendants' alleged conduct. Thus, there is no indication that counsel knew or should have known that Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen would be named as defendants in an amended complaint.

---

[12] Since Laboriel does not dispute whether this is his actual shield number, the court assumes it is correct.

New York's relation back doctrine also fails to save Brown's untimely state law claims against Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. The relation back doctrine under New York law allows claims against a new defendant to relate back to timely filed claims previously asserted against a co-defendant when (1) the new claims arose out of the same conduct, transaction, or occurrence as the original allegations; (2) the new defendant is "united in interest" with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new defendant knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well. *Buran v. Coupal*, 661 N.E.2d 978, 981 (N.Y. 1995); *see also* N.Y. C.P.L.R. § 203; *Strada v. City of New York*, No. 11-cv-5735, 2014 WL 3490306, at *6 (E.D.N.Y. July 11, 2014). "This test was patterned largely after the Federal relation back rule . . . and, at least with respect to its third prong, it uses the same standard as Federal Rule 15." *Fisher*, 2011 WL 4899920, at *5 (internal quotation marks and citations omitted). As discussed above, there is no indication here that Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen knew or should have known that they would be added as defendants. Thus, New York's relation back doctrine is unavailing as well.

Nor can Brown simply substitute Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen for the "John Doe" and "Jane Doe"

defendants listed in the original complaint. Section 1024 of the New York Civil Practice Law and Rules allows a plaintiff to replace a John Doe defendant with a named party after the statute of limitations has run if (1) the plaintiff exercised "due diligence, prior to the running of the statute of limitations, to identify the defendant by name," and (2) the plaintiff described "the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." *See Hogan v. Fischer*, 738 F.3d 509, 518–19 (2d Cir. 2013). Here, regardless of whether Brown exercised due diligence, he cannot rely on § 1024 because he did not provide any identifying information whatsoever about any of the John Doe defendants listed in the original complaint.

In sum, Brown's state law claims are dismissed as to Commissioner Ponte, Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen. These claims remain, however, as to the City, Deputy Warden Laboriel, Assistant Deputy Warden Beltz, Captain Skepple, and CO Freire.

### IV. Brown's Motion for Reconsideration

Brown was able to file his amended complaint in this action because the court granted him leave to do so on November 13, 2015. ECF No. 49. Brown now asks the court to reconsider that November 13, 2015 decision because, when he filed his amended complaint, he mistakenly deleted former DOC Commissioner Schriro as a defendant. ECF No. 73. Brown's motion for reconsideration is denied.

Brown's motion for reconsideration is governed by Local Rule 6.3. Under Local Rule 6.3, a motion for reconsideration must be served within fourteen

days after the court's determination of the original motion. Here, the underlying decision was entered on November 13, 2015. Brown's request for reconsideration, however, was not filed until April 21, 2016. Thus, the motion is untimely, and it can be denied on that basis alone. *See Garcia v. BAE Cleaners Inc.*, No. 10-cv-7804, 2012 WL 98511, at *1 (S.D.N.Y. Jan. 11, 2012).

But even if the motion were timely made, it would still be denied. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Here, Brown does not point to any controlling decisions or data that *the court* overlooked; he only says that *he* erred while drafting his amended complaint. The motion for reconsideration is, therefore, denied. If Brown wishes to amend his complaint a second time, he may file a motion seeking leave to do so pursuant to Federal Rule of Civil Procedure 15(a).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss certain claims in the amended complaint is granted in part and denied in part. All of Brown's claims against the Individual Defendants in their official capacities are dismissed. All of Brown's § 1983 claims against Commissioner Ponte and CO Freire are dismissed for lack of personal involvement. Brown's § 1983 claims for deliberate indifference only are also dismissed as to Warden Suprenant, Deputy Warden Laboriel, Deputy Warden O'Connell, Assistant

Deputy Warden Beltz, Captain Skepple, and CO Tietjen. Brown's claims under the New York State Constitution against the Individual Defendants are dismissed. Brown's claim against the City for negligent hiring and retention is dismissed. Brown's state law tort claims against Commissioner Ponte, Warden Suprenant, Deputy Warden O'Connell, Captain Rudolph, and CO Tietjen are dismissed. All other claims in the amended complaint remain.

Brown's motion for reconsideration is denied.

This opinion resolves the items listed at docket numbers 63 and 73.

SO ORDERED.

Dated: New York, New York
April 17, 2017

_____
Thomas P. Griesa
United States District Judge